**HOLIDAY INNS INC., Holiday Inns Inc. (Lebanon), Plaintiffs,**

v.

**AETNA INSURANCE COMPANY, Defendant.**

**AETNA INSURANCE COMPANY, Third-Party Plaintiff,**

v.

**AMERICAN COMMONWEALTH AS-SURANCE COMPANY, LTD., Third-Party Defendant.**

No. 77 Civ. 2623–CSH.

United States District Court, S.D. New York.

Sept. 19, 1983.

and Declaration of Trust; Article I, Section 7 of    Plan Regulations.

Peter Megargee Brown, Cadwalader, Wickersham & Taft, New York City, for plaintiffs Holiday Inns, Inc. and Holiday Inns (Lebanon) Inc.; Richard H. Walker, New York City, John W. McConomy, Memphis, Tenn., of counsel.

Rein, Mound & Cotton, New York City, for defendant Aetna Ins. Co.; Ernest E. Rosenberg, Arthur N. Brook, Andrew Maneval, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs Holiday Inns, Inc. ("HI") and Holiday Inns (Lebanon), Inc. ("HI–L") bring this action against defendant Aetna Insurance Company ("Aetna") to recover under an insurance policy in force when plaintiffs' hotel in Beirut, Lebanon was severely damaged by events occurring during a period from October, 1975 to April 9, 1976. Aetna contends that the damage resulted from excluded causes. This Court's opinion of June 20, 1979 held that Aetna had the burden of proving that proposition. After extensive pre-trial discovery, the issue of coverage under the policy was tried to the Court without a jury. The quantum of plaintiffs' recovery, assuming coverage, was reserved. Thus this decision is limited to whether or not the loss is covered by the policy.

### I.

*The Decision of the Second Circuit in Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*

For reasons that will become apparent, I begin with an incident occurring over the skies of London on September 6, 1970. On that day members of the Popular Front for the Liberation of Palestine ("PFLP") hijacked a Pan American jet aircraft. The aircraft ultimately landed at Cairo where, after all passengers were evacuated, the hijackers destroyed it.

Pan Am instituted suit because none of the several insurers whose policies covered the aircraft accepted coverage. The litigation resolved itself into a struggle between the "all risk" insurers and the "war risk" insurers, the latter's policies being intended to cover causes of loss excluded under the all risk policies. Affirming the judgment of this Court, 368 F.Supp. 1098 (S.D.N.Y. 1973) (Frankel, D.J.), the Second Circuit held the all risk insurers liable because "none of the all risk exclusions, considered in a light most favorable to the insured, fairly describes the cause of the present loss." *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 1022 (2d Cir.1974) (hereinafter *"Pan Am"*).

The Second Circuit decided *Pan Am* on October 15, 1974. At that time HI was negotiating, through brokers, with present defendant Aetna the all risk policy forming the subject matter of the case at bar. That policy issued under date of March 11, 1975. The "Aetna" involved in *Pan Am* was a different company. But the Second Circuit, in a scholarly, 33-page opinion by Judge Hays, with encyclopedic citation of authori-

ty, placed the insurance industry on notice when it declared certain principles of insurance law applicable to, and defined terms appearing in, all risk property policies. It often happens that insurers and their insureds, litigating the question of coverage, draw analogies to judgments of prior centuries. The Second Circuit performed that historical analysis in *Pan Am,* updating the ancient insurance phrases within the general context of this century's tragic Middle East strife; and it did so during the gestation period of the very policy in suit. *Pan Am* accordingly figures prominently in this Court's judgment. But first I consider the origin of the policy, and its dispositive terms.

## II.

*The Origin of the Policy in Suit.*

HI is a Tennessee corporation which, among other business activities, owns and operates lodging establishments throughout the world. HI carries property insurance on these establishments. Prior to 1969, HI carried insurance on its foreign property through the American Foreign Insurance Association ("AFIA"), an unincorporated association which acts as a foreign department for a group of leading American insurance companies, including Aetna. In 1969 HI switched its foreign insurance to American International Underwriters ("AIU"), a competitor of AFIA.

One of HI's foreign properties was a building it operated as a hotel in Beirut, Lebanon. HI had leased the building in June, 1969 from the Saint Charles City Center, a Lebanese corporation. At the pertinent times HI–L, a Tennessee corporation and wholly-owned subsidiary of HI, had succeeded to HI's rights under the lease with St. Charles City Center.

From 1969 the AIU policy covered HI's foreign properties, including the Beirut hotel, which was called (consistent with corpo-

rate worldwide practice) the "Holiday Inn." The AIU policy was renewed yearly until 1975. It was not renewed that year for the reasons described below.

During the summer of 1974 John J. Geary, AFIA's resident vice president in Chicago, decided to try to recapture the insurance of HI's foreign properties. Geary knew William A. Day, in charge of HI's insurance matters, and William G. Miller, his associate. Geary opened up negotiations with them. The HI executives were receptive. In putting together a proposal, Geary worked with Claude Lair, a property underwriter in New York whose function it was to review, accept or reject risks, and to determine premiums for the risks his principals would accept.

Lair's first quotation on behalf of insurers was summarized by Geary thus: "They said they would give riots, strikes and civil commotion in Europe and riot, strike elsewhere." [1] This means that the insurers were offering broader coverage for HI properties located in Europe than in other parts of the world. In Europe, the insurers proposed to cover damage caused, *inter alia,* by riots, strikes and "civil commotion"; elsewhere, civil commotion coverage was not offered.

Geary argued with Lair about the Beirut hotel. That discussion took place on February 26, 1975. Geary viewed Beirut as "the Paris of the Middle East"; he urged Lair to extend civil commotion coverage to the hotel there because "it would be better for the insured." [2] Lair finally agreed, but told Geary "you ought to get more money," because as originally quoted "the rate did not contemplate civil commotion." [3] Geary then advised Day at HI that, in respect of the Beirut property, "I now have permission from New York to extend that, to change it from riot, strike to SRCC." [4] Geary was pleased to have persuaded the New York underwriter because "it sweetened the poli-

1. Geary dep. at 51.

2. *Id.* at 54.

3. *Id.* at 56.

4. *Id.* at 61. "SRCC" is shorthand for "strike, riot, civil commotion."

cy for Holiday Inns" by providing "broader coverage." [5]

Negotiations between AFIA and HI culminated in a policy issued by Aetna, an AFIA member, on March 11, 1975. Civil commotion coverage for the Beirut property was specifically included. HI paid an additional premium for it.

## III.

*The Pertinent Provisions of the Policy.*

The policy consists of a printed form, typed additional provisions, and a number of printed or typed endorsements. The intricacies of their interrelationship were considered in this Court's prior opinion of June 20, 1979, familiarity with which is assumed. It is not necessary to repeat the exercise. Nor need HI have done so in its post-trial brief at 20–26; Aetna does not dispute the identity or wording of the controlling provisions. Cf. Aetna post-trial brief at 1.

In short, Aetna issued HI an all risk policy covering against "all risks ... of direct physical loss or damage to the above described property from any external cause except as hereinafter provided." The exclusions upon which Aetna relies appear in Form 1301, endorsement No. 5 to the policy. That endorsement provides in pertinent part:

"2. This insurance does not cover:—

"a) Loss or damage caused by any of the perils hereby insured against, if such loss or damage either in origin or extent is directly or indirectly, proximately or remotely, occasioned by or contributed to by any of the following occurrences, or, either in origin or extent, directly or indirectly, proximately or remotely, arises out of or in connection with any of such occurrences, namely:—

**5.** *Ibid.*

**6.** It is possible for all risk insurers to draft language casting the burden of proof of causation upon the insured where the insurer denies coverage on the basis of an excluded peril. *Spinney's (1948) Ltd. v. Royal Insurance Co., Ltd.,* [1980] 1 Lloyd's L.Rep. 406 (Q.B.), is such

"War, invasion, act of foreign enemy, hostilities or warlike operations (whether war be declared or not), civil war, mutiny, insurrection, revolution, conspiracy, military or usurped power."

Aetna contends that the damage to the Holiday Inn in Beirut was caused by human forces constituting the excluded perils of insurrection, civil war, and war.

The quoted exclusions in Form 1301 are preceded by the provision which extended civil commotion coverage to the Beirut property. The form also provides:

"1. This policy covers physical loss or damage to the property insured (including loss or damage due to fire or explosion) directly caused by persons taking part in riots or civil commotion or by strikers or locked-out workers or by persons of malicious intent acting in behalf of or in connection with any political organization; also loss of or damage to the property insured (including loss or damage due to fire or explosion) directly caused by the action of any lawfully constituted authority in connection with the foregoing perils only."

## IV.

*Principles and Definitions Declared by the Second Circuit in the Pan Am Case.*

A. *Legal Principles*

It is now useful to review the pertinent principles declared by the Second Circuit in *Pan Am.*

1. Under an all risk policy, the insured need not prove the cause of the loss. It need only prove the existence of the all risk policy, and the loss of the covered policy. The insurer then has "the burden of proving that the proximate cause of the loss ... was included within one of the terms of exclusion." 505 F.2d at 999.[6]

a case; see the clause reproduced at 411. Indeed, certain portions of the policy in suit contained such language. But I held in my prior opinion that, in the circumstances of the case, the language did not operate to relieve Aetna of the burden of proof and cast it upon HI. I do not reiterate the reasons here.

■ 2. Exclusions "will be given the interpretation which is most beneficial to the assured." *Ibid.*

■ 3. To avoid coverage, "it is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion." *Id.* at 1000. This principle is described by the Second Circuit as a manifestation of the rule of construction contra proferentem.

■ 4. Contra proferentem "defines the scope of coverage as much as if it were a clause in the all risk policies"; experienced all risk insurers must expect "the exclusions drafted by them to be construed narrowly against them," *id.* at 1003–04.

■ 5. Where an all risk policy excludes "loss or damage due to or resulting from" enumerated perils, these words limit the inquiry concerning proximate cause "to the facts immediately surrounding the loss." That is to say, "the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." It is "a mechanical test of proximate causation for insurance cases, a test that looks only to the 'causes nearest to the loss.'" At least, that is so in respect of a policy worded like that in *Pan Am;* the Court of Appeals added the *caveat:* "if the insurer desires to have more remote causes determine the scope of exclusion, he may draft language to effectuate that desire." *Id.* at 1006–07.

6. In commercial litigation arising out of insurance policies, words and phrases are construed "for insurance purposes"—a context quite different from those of politics or journalism. Thus the Second Circuit summarized the issue in *Pan Am:*

"We are asked on this appeal to determine which of the various underwriters that insured the aircraft must bear the cost of the loss. This determination depends on whether the September 6 hijacking was proximately caused by an agency fairly described, *for insurance purposes,* by any of the exclusions contained in a group of identical all risk aviation policies—policies which, if not for the exclusions, would cover the loss." *Id.* at 993 (emphasis added).

Comparable reasoning appears in *Spinney's (1948) Ltd. v. Royal Insurance Co. Ltd., supra,* a case which like that at bar involved the violence in Lebanon in 1975 and 1976. Mr. Justice Mustill was asked by one of the litigants to inquire of the Secretary of State for Foreign Affairs whether the situation in Lebanon constituted a "civil war" (that being an excluded peril under the policy in suit). The judge declined to do so:

"The issue is not whether the events in Lebanon were recognized by the United Kingdom as amounting to a civil war in the sense in which the term is used in Public International Law with the corollary that this country would, if the occasion had arisen, have accorded to the participants the rights and demanded of them the duties appropriate to belligerents. The question here is whether there was a civil war within the meaning of the policy. The two questions are not the same, and a pronouncement by the Secretary of State on one will not suffice to decide the other: (citing cases) ... When deciding whether the excepted perils apply, the ascertainment of primary facts is only one step in the process. The real problem is to interpret what was happening, in the light of the words used in the policy.... Answering the question would require the Secretary of State to ascertain the meaning of the words used in the policy, and unless the Court could be sure that the Secretary of State and the Court were adopting the same interpretation, the exercise would serve only to confuse...." [1980] 1 Lloyd's L.Rep. at 426.

**B. *Policy Definitions***

The all risk insurers in *Pan Am* argued that the aircraft's destruction at the hands of hijackers fell within a number of exclud-

ed perils. They included "war," "civil war," and "insurrection." These are the exclusions upon which Aetna relies in the case at bar. The *Pan Am* policy also excluded "riots" and "civil commotion" from coverage. As noted *supra,* the Aetna policy covers damage from such causes. The Second Circuit's definitions of these phrases, declared in *Pan Am* at a time when the policy in suit was being negotiated in the New York underwriting market, are of obvious significance to this Court.

### 1. *War*

Having reviewed English and American cases, 505 F.2d at 1012–1015, the Second Circuit concluded in *Pan Am* that "war is a course of hostility engaged in by entities that have at least significant attributes of sovereignty." *Id.* at 1012. The court summarizes the definition:

> "English and American cases dealing with *the insurance meaning* of 'war' have defined it in accordance with the ancient international law definition: war refers to and includes only hostilities carried on by entities that constitute governments at least de facto in character." *Ibid.* (emphasis added; note again the emphasis on definition for insurance purposes).

■■■ For insurance purposes, then, "[w]ar can exist between quasi-sovereign entities." It follows that "war" does *not* include "conflicts waged by guerrilla groups regardless of such groups' lack of sovereignty." The Second Circuit in *Pan Am* rejected that contention by the all risk insurers, holding instead that "a guerrilla group must have at least some incidents of sovereignty before its activities can properly be styled 'war.'" *Id.* at 1013.

The all risk insurers' reliance upon the "war" exclusion failed in *Pan Am* because the PFLP, to which the hijackers belonged, had not been accorded by Middle Eastern states "the rights of a government.... No Arab state recognized the PFLP. The fact that the PFLP received financial support from several states does not give it the status of a 'quasi-sovereign.'" Nor could the PFLP's own exaggerated rhetoric, pro-

claiming itself to be "at war with the entire Western World," change the practical realities. The court held the "war" exclusion inapplicable in *Pan Am* because the hijackers who constituted the efficient physical cause of the loss "were the agents of a radical political group, rather than a sovereign government." *Id.* at 1015.

### 2. *Insurrection*

After disposing of the all risk insurers' reliance upon the exclusion for "warlike operations"—a phrase appearing in the Aetna policy but which Aetna does not press—the *Pan Am* court dealt with the insurance meaning of "insurrection." The Second Circuit coupled its consideration of "insurrection" with that of "civil war," for reasons which appear from its analysis at 505 F.2d 1017:

> "In the district court the all risk insurers relied on every term in clause 2 except 'invasion.' Thus, aside from 'war' and 'warlike operations,' they claimed that the loss was excluded from coverage by each of 'civil war,' 'revolution,' 'rebellion,' and 'insurrection.' Their efforts soon focused on the last of these terms, because all parties agreed that if the loss was not caused by an 'insurrection,' then it could not have been caused by any of the other clause 2 terms relating to civil disorders. 'Insurrection' presents the key issue because 'rebellion,' 'revolution,' and 'civil war' are progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.' See *Home Insurance Co. v. Davila,* 212 F.2d 731, 736 (1st Cir.1954); cf. *The Brig Amy Warwick* (The Prize Cases), 67 U.S. (2 Black) 635, 666, 17 L.Ed. 459 (1862). The district court accordingly confined its inquiry to insurrection, see 368 F.Supp. at 1123–1124, and we shall do the same."

Judge Frankel, writing for this Court in *Pan Am,* held that for insurance purposes "insurrection" means "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." 368 F.Supp. at 1124. Judge Frankel relied

upon *Home Insurance Co. v. Davila,* 212 F.2d 731 (1st Cir.1954), an opinion by Chief Judge Magruder which the Second Circuit characterized in *Pan Am* as "the chief case on the insurance meaning of insurrection." 505 F.2d at 1017.

*Davila* involved violent acts in Puerto Rico by members of the Nationalist Party of Puerto Rico, a band of extremists possessing a rudimentary military organization with cadets, officers, and a training program. Four carloads of Nationalists arrived at a town where the insured's property was located, set fire to it, battled the police, impeded the firemen, and ran up the Nationalist flag. The insurers defended on the exclusion of "insurrection" as a covered peril. The First Circuit reversed a jury verdict for the insured and remanded for a new trial because the trial judge improperly failed to instruct the jury that "if the Nationalist leaders had the 'maximum objective' of overthrowing the government, then a jury might find that the loss was caused by an insurrection." That revolutionary purpose need not be objectively reasonable; "[a]ny intent to overthrow, no matter how quixotic, is sufficient." *Pan Am,* paraphrasing *Davila* at 505 F.2d 1018. But an intent to overthrow the established government is essential to the existence of an insurrection.

The necessity of that element of intent is clear from the Second Circuit's application of the *Davila* rule to the facts in *Pan Am.* The defense of "insurrection" was rejected because:

"... the all risk insurers did not support their burden of proving that at the time of the loss the PFLP intended to overthrow King Hussein." 505 F.2d at 1018.

Reviewing the evidence, Judge Hays' opinion quoted a statement by the PFLP founder that the "aim of the Palestinian resistance was not to overthrow the Jordanian regime, but merely to put pressure on it." *Ibid.* The analysis concludes:

"From the welter of conflicting evidence, reasonable men might draw any of a number of conflicting conclusions about the PFLP's motives on September 6.

One of those reasonable conclusions is that the PFLP did not intend to overthrow King Hussein when it hijacked the Pan American 747. The hijacking was designed to attract world attention to the Palestinian cause and to accumulate 'victories' as an example to other groups. It was a 'symbolic blow' in the PFLP's fight against the United States. The all risk insurers failed to carry the burden of proving the crucial element of PFLP intent." *Id.* at 1018–19.

This language is significant not only because it demonstrates that the specific intent to overthrow the established government is a *sine qua non* of an insurrection. The Second Circuit analysis also measures the weight of the burden of proof falling upon an all risk insurer who relies upon excluded perils. It is not sufficient for the insurer to prove a set of circumstances from which the requisite intent is one of several plausible conclusions that a reasonable factfinder could draw. The insurer must prove the existence of "the crucial element of intent"; and its proof must negate the existence of differing intents or purposes which, if present, would result in policy coverage.

### 3. *Civil War*

The Second Circuit did not deal at length with "civil war" in *Pan Am* because it regarded "insurrection" and "civil war" as "progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.'" Thus if there was no insurrection, there could by definition have been that higher form of strife, a civil war. The Second Circuit's discussion indicates that the litigants in *Pan Am* all accepted this proposition. To the extent that *Pan Am* defines "civil war," it must surely be read to require that specific intent to overthrow established government which is also essential to an insurrection. This subject is further dealt with under Point VIII(2), *infra.*

### 4. *Civil Commotion; Riot*

In dealing with "civil commotion" and "riot," the Second Circuit said in *Pan Am*

that these terms "have a domestic flavor that contrasts sharply with the sense of the terms employed in the other clauses," such as "war," which admits "of application to occurrences with international contexts." *Id.* at 1019. The court continues:

> "Insurance authorities are in accord on the local nature of these perils. 'Civil commotion ... import[s] occasional local or temporary outbreaks of unlawful violence.' 11 G. Couch, Cyclopedia of Insurance Law 42:487 (2d ed. 1963); *Boon v. Aetna Insurance Co.,* 3 Fed.Cas. p. 871 (No. 1,639) (C.C.D.Conn.1874), rev'd on other grounds, 95 U.S. 117, 5 Otto 117, 24 L.Ed. 395 (1877); Adel Salah El Din, Aviation Insurance Practice, Law & Reinsurance 112–13 (1971). Riots and civil commotion are purely 'domestic disturbances.' *Rogers v. Whittaker,* [1917] 1 K.B. 942, 944. There is no authority for the proposition that riots or civil commotion are other than local, domestic disturbances." *Ibid.*

Because this is so, the Second Circuit held that "civil commotion does not comprehend a loss occurring in the skies over two continents." *Id.* at 1020. Judge Frankel's definition of civil commotion was approved: "essentially a kind of domestic disturbance," referring to disorders "such as occur among fellow-citizens or within the limits of one community," the Second Circuit adding:

> "For there to be a civil commotion, the agents causing the disorder must gather together and cause a disturbance and tumult." *Id.* at 1020.

As for "riot," the Second Circuit approved Judge Frankel's definition:

> "... a riot occurs when some multitude of individuals gathers and creates a tumult." *Id.* at 1021.

Taking the principles and definitions declared in *Pan Am* as constituting the binding law in this Circuit, I turn now to the events which resulted in the damage to the Holiday Inn in Beirut. I first consider the immediate causes of the damage, physical and mechanical, to be followed by an over-view of the circumstances in which those events occurred.

## V.

*The Damage to the Holiday Inn, Beirut.*

The Republic of Lebanon has a surface of roughly 4,000 square miles. Lebanon measures 135 miles from north to south, and is approximately 35 miles wide at its broadest point. Lebanon borders Israel on the south, Syria on the north and east, and the Mediterranean Sea on the west.

The capital, Beirut, is the largest city in Lebanon, situated on the Mediterranean coast, midway along the country's length. The main roads from Beirut lead north along the coast to the ports of Jounieh and Tripoli; south along the coast to the ports of Sidon and Tyre; and east to Damascus, the capital of Syria.

At the times with which this case is concerned Beirut was divided. Ultimately this division was manifested by the so-called "Green Line," which bisected the city in a north-south direction, into East Beirut and West Beirut. The Lebanese population of East Beirut was predominantly Christian; West Beirut was predominantly Moslem. Beirut was also ringed by a number of camps housing Palestinian refugees.

The Holiday Inn, Beirut, first opened for operation in 1974. It was a 26-floor structure which, during its brief operative life, had a revolving restaurant on the top floor, a nightclub on the 25th floor, some 400 guest rooms, office spaces, and a ground floor lobby and the usual public rooms. The Holiday Inn was located in the northeastern quadrant of West Beirut, close to the port facilities. A number of other first-class hotels were in this area, including the Intercontinent, the Phoenicia, the Hilton, and the Saint Georges, the latter being directly on the water. Just to the south of this grouping of hotels lay Kantari, a residential and commercial district occupied for the most part by Moslems. The Holiday Inn, while one of the taller buildings in Beirut, was not the tallest: that distinction belonged to the Murr Tower, a concrete

structure which in October of 1975 was nearing completion several blocks to the south-east of the Holiday Inn.

On Saturday, October 25, 1975, a battle began for possession and control of the Kantari district. Kantari, in West Beirut, "was a rather expensive residential area lying between the city center to the west, the newly built international hotels to the north [of which the Holiday Inn was one], the commercial district to the east and poorer Moslem suburbs to the south." [7] There had been fighting in Lebanon for some seven months; but the battle for Kantari marked the emergence of a new fighting force on the streets of Beirut. This was the Mourabitoun, the militia force of the Independent Nasserite Organization. The existence of the Independent Nasserite Organization was well known; it was one of numerous groups comprising what may generally be described as the "Moslem left" (as opposed to the Christian right). What had not been realized was that the Independent Nasserite Organization had a large and effective militia. These were the Mourabitoun.[8] On October 25, 1975, the Mourabitoun organized an attack from one of the Moslem suburbs to the south, driving west into Kantari toward the sea front. The Independent Nasserites and the Mourabitoun were directed by Ibrahim Kleilat, who was about to be "transformed from a back-street gangster into a politician" by the events which began on October 25.[9]

In their attack upon the Kantari district, the Mourabitoun were joined by some Saiqa militiamen. The Saiqa was a Palestinian commando organization, backed by Syria. The Mourabitoun were also joined by fighters of the radical Palestinian organizations Popular Democratic Front for the Liberation of Palestine ("P.D.F.L.P.") and Popular Front for the Liberation of Palestine ("P.F. L.P."). The opponents of these forces consisted of militiamen from the Phalange and the Party of Liberal Nationalists ("P.N.L."). The Phalange was organized along paramilitary lines in the mid-1930's. It drew most of its support from the Christian population of Lebanon, although some Moslems were also to be found in its ranks. The Phalangist Party was directed by Sheikh Pierre Gemayel, a leading Maronite Christian. By 1975, the Phalange was the largest of the predominantly Christian groups, with the largest and best armed militia. The P.N.L., also predominantly Christian, had been founded by Camille Chamoun, a former president of Lebanon. Its militia, called the Tigers, numbered at least 3,500 men in 1975.[10]

The population of the Kantari district was mixed, but it was under the control of the Phalange. The Phalangists living in Kantari were not full-time militiamen; they were members of their party whose job it was to defend their own area if called upon to do so. For this purpose, they retained in their homes such weapons as machine guns, rifles, rocket launchers, and grenades. In view of the prevailing circum-

---

7. The quotation is from *Death of a Country* (Weidenfeld and Nicolson, London, 1977), by John Bulloch, at p. 12. Bulloch, an English journalist resident in Beirut at the pertinent times, gave deposition evidence on behalf of Aetna. A copy of his book was marked defendant's exhibit 5 at Bulloch's deposition and received into evidence at trial without objection as "support for Mr. Bulloch's testimony." Tr. 112. The book is a useful recitation of a trained observer's observations. It is subsequently cited as "DOAC."

8. Bulloch dep. at 58.

9. DOAC, photograph caption following p. 90.

10. Much of the discussion under this and succeeding headings is derived from HI's requests for admission promulgated to Aetna under Rule 36, F.R.Civ.P., and Aetna's responses thereto. "Though Rule 36 has not been resorted to as much as some of the other discovery rules, it is a valuable time saver when properly used." 8 Wright and Miller, *Federal Practice and Procedure* (1970) at 704. The case at bar demonstrates the truth of this assertion when the parties are represented by skilled advocates who deal with each other and the Court in a spirit of professional good faith. References to the requests are designated "R.A." I have, of course, made use of the requests only to the extent that Aetna admits them. The discussion in this paragraph is derived from R.A. 53, 54, 62, and 107.

stances, the Phalangists kept people on guard each night.[11]

The Mourabitoun had as their particular objective, during the attack launched on October 25, the Murr Tower, then under construction at the end of Selim Boustiany Street. As noted, the Murr Tower was the tallest building in Beirut, several blocks to the southeast of the Holiday Inn. The Murr Tower was defended by units of Phalangist militia. After launching some diversionary attacks down other streets, which had the effect of drawing some Phalangist militia away from the Murr Tower, the Mourabitoun launched a frontal attack upon the Murr Tower, "an ordinary infantry type attack assault, using assault rifles, grenades, machine guns, rockets."[12] The remaining Phalangist guards around the base of the Tower responded with machine guns, rifles, rocket launchers, and grenades. Substantially outnumbered, the Phalangists retreated to the first floor of the Murr Tower, and from there were able to hold off the attackers for several hours; but eventually, all Phalangists guarding the Murr Tower were killed, and the Mourabitoun succeeded in taking the Tower. Having done so, they went up into its higher floors, from which they could command a wide field of fire.[13]

As the fighting in Kantari progressed, the bells of the Christian churches were rung, and all Phalangists in the area turned out to resist the Mourabitoun. In other parts of Kantari, the Phalangists were able to repel the attacks; the quick seizure of the Murr Tower constituted the Mourabitoun's main success of the night.[14]

Having seized the Murr Tower, the Mourabitoun installed sand bags and heavy machine guns on the top floors. By doing so, the Mourabitoun were able to harass Phalangist street movements in several directions. "After their quick success in Kan-

tari, the Mourabitoun seemed to run out of steam"; in this, their first appearance in the streets, the Mourabitoun "had fought tenaciously and well to prove themselves a match for any of the other proliferating private armies.... Having made their point, they were content to sit back for a while, to collect the spoils of war and leave it to their leaders to reap the political harvest."[15]

In November and December, 1975, fighting continued in this part of Beirut. The Phalangist militia continued to hold the hotels in the sea front district, including the Holiday Inn. In consequence, there was fighting between the Phalangist militia in these hotels, and the leftist forces in the surrounding areas. Fire was exchanged between the Murr Tower and the sea front hotels. In addition, people on the ground would fire at the hotels. The weapons used included machine guns, rocket launchers, and rifles.[16]

In October of 1975, the European comptroller for HI was Jan Reedijk. Reedijk was based in Brussels, and those in charge of the Holiday Inn, Beirut reported to him. Reedijk happened to be in Memphis, Tennessee, the HI headquarters, when he first heard that the Holiday Inn, Beirut had suffered damage. At some time in November, 1975, Reedijk, while in Memphis, received a telephone call from a Mr. Saikali, the local comptroller in charge of the Holiday Inn, Beirut. Saikali told Reedijk that the Holiday Inn had been occupied by Phalangist militia, and that the hotel had incurred "some damage, but nothing major."[17] After having been assured that it was safe to do so, Reedijk went to Beirut on November 26, 1975 and inspected the hotel in the company of the local managers. Reedijk stayed in Beirut only one day. At the time the Phalangists moved into the Holiday Inn, there were only about fifty guests resident

11. Bulloch dep. at 59–60.

12. *Id.* at 61.

13. *Id.* at 61–62; DOAC, pp. 15–16.

14. DOAC at p. 16.

15. *Id.* at p. 24.

16. Bulloch dep. at 68–69.

17. Reedijk dep. at 8.

there; they were moved out, and this constituted the last time that guests stayed at the Holiday Inn.[18] During his examination of the building, Reedijk observed that the top-floor restaurant was not operational. Its windows had been shot out, and fire and water damage had taken place. Twelve private accommodation rooms had been totally destroyed; 15 rooms were partially damaged by fire; and there were about 35 additional rooms with slight damage consisting of torn or burned curtains and broken glass.[19]

Another Holiday Inn employee connected with the Holiday Inn, Beirut who first heard about the fighting while in Memphis was Nabil Chartouni, a Lebanese, who in October of 1975 was vice-president for Middle East development of the Holiday Inns organization. He was stationed at the Holiday Inn, Beirut. In late October 1975, Chartouni was in Memphis attending a business conference. He received a telephone call from his secretary at the Holiday Inn, Beirut, Maria Kazandjian. Chartouni had heard of the Holiday Inn having sustained some damage on the news; Ms. Kazandjian then telephoned him, and said: "Everything is terrible. We are down in the basement now, all the employees and quite a few of the guests, and the bombardment is continuous and the fighting is continuous." Kazandjian did not specify who was doing the bombarding or the fighting, except to say that "some elements were fighting in the hotel, mainly Phalangists." [20]

Chartouni returned to Beirut in mid-November, at which time he found the hotel empty of guests. When he returned, he found that the hotel facade was damaged in several places. It had been hit by rockets; glass windows had been broken; there was fire damage inside the rooms on several floors; and some looting had taken place. Chartouni XBT at 18. The hotel was closed to guests.[21]

Upon his return, Chartouni took charge of the Holiday Inn, Beirut. His main objective was to protect the hotel and maintain the status quo by keeping the damage to an absolute minimum, and trying through his contacts in the area to keep the combatants from coming into the hotel. As noted, Chartouni was not in the hotel when it was first damaged; but on the basis of the reports he received, and his own knowledge of conditions in Beirut, he identified the forces who entered the Holiday Inn when the Mourabitoun launched their attack and seized the Murr Tower as "a hodge podge of various people who happened to be Christian or Moslem at that time, to be fighting on the same side, trying to gain control of a certain area.... You can call them Rightists." [22]

During the period between late October and December 6, 1975, there was "little activity" of a hostile nature in Beirut; "the 'hotels front' was the most active, with the Leftists holding the Palm Beach and Excelsior, and occasionally trading fire with the Phalangists in the Holiday Inn, Saint Georges and Phoenicia." [23] On December 6, 1975, the fighting sharply escalated as the result of what came to be known as "Black Saturday." On the night before, four Phalangist leaders were found murdered on the outskirts of a village in the Christian area. While the murderers were unknown, "it was presumed that it was some Moslem Leftist Palestinian 'factions' and therefore many of the armed Christian individuals went into the streets basically in the port area of Beirut, and they slaughtered many Moslem people." [24] Moslem leaders sought to prevent a comparable retaliation;[25] but

**18.** *Id.* at 10.

**19.** *Id.* at 29.

**20.** Chartouni dep. at 10.

**21.** *Id.* at 13, 15, 18, 22.

**22.** *Id.* at 25–28.

**23.** DOAC at pp. 93–94.

**24.** Chartouni dep. at 38. In point of fact, hundreds of unarmed Moslems were murdered in Beirut. The parties agree that "Black Saturday ... marked *the start of the most serious fighting in Beirut to date.*" R.A. 122.

**25.** DOAC at p. 97.

some Moslems retaliated "and slaughtered several Christian people." [26] In particular, the Moslem leaders could not stop a punitive assault launched against Phalangist militia men holding the hotel area of Kantari. "Ibrahim Kleilat's Mourabitoun began the assault, spurred on by their determination to exact vengeance for what had happened over the previous two days, and were successful in throwing the Phalangist defenders out of the Saint Georges and Phoenicia hotels, causing considerable casualties to the defenders...." [27]

These events manifested themselves to Chartouni in the Holiday Inn when Phalangist militia men came into the hotel, shortly after "Black Saturday" to take up positions. It is indicative of the extent to which labels tend to blur in Lebanon that the first Phalangist entering the Holiday Inn with weapons was named "Mohamed"; Chartouni asked him "what in hell" he was doing with the Rightists if his name was Mohamed, and received the answer that the last time the Phalangists were in the Holiday Inn, "there was eight of us here, Moslems, out of 30"—"it has nothing to do with being Christian or Moslem. We are just fighting for a good cause." [28] Other militia men came into the Holiday Inn; Chartouni decided that it was time to get his employees out. No government agencies were available to send assistants to evacuate the Holiday Inn employees; eventually the American Embassy sent two personnel carriers in response to Chartouni's statement (untruthful, but surely excused by the exigencies of the situation) that two American citizens were trapped in the hotel. At this time, the Holiday Inn had on the premises a skeleton staff of about 30; when the hotel was operating, the staff numbered 500 employees. [29]

Chartouni and certain other Holiday Inn employees were evacuated to the Phoenicia hotel where they remained for some time until the Phoenicia came under increasing fire from Leftist factions that had seized the Saint Georges hotel. At this time, "fire was raging all over the place"; from the Phoenicia, Chartouni could observe that the Saint Georges hotel had been looted and was then set on fire. [30] He could also observe the Holiday Inn, which remained in the hands of the Phalangists. The Holiday Inn was coming under fire from both the Murr Tower and from the Saint Georges. Chartouni could see fires breaking out "from various floors" at the Holiday Inn. [31] Eventually Chartouni was able to leave the Phoenicia hotel in armoured carriers sent by the Lebanese Army. Chartouni spent several days in the mountains, and then formed the desire to get out of Lebanon at that time, "because I felt it was a futile exercise any more to try to protect the hotel." [32] Chartouni departed Beirut to visit his family in Austria on or about December 13, 1975. While he returned to Beirut periodically for meetings and other business, he did not again go to the hotel district. [33]

The post-Black Saturday fighting saw the Mourabitoun on the attack and the Phalangists being driven back. However, the Phalangists held their last defensive line near their headquarters, "and after more than a week the battle ground to a halt as the left-wing militia realized they had taken all the ground they could, and stood no chance of scoring the outright victory they had sought." [34] That left a Phalangist redoubt jutting into western Beirut; a redoubt which included the Holiday Inn.

During the December fighting, the Holiday Inn had been reoccupied by members of rightist militias. Parts of the hotel were set afire and numerous floors were hit by grenades. By Friday, January 2, 1976, the

---

26. Chartouni dep. at 30.

27. DOAC at p. 98.

28. Chartouni dep. at 40.

29. *Id.* at 40–43.

30. *Id.* at 50.

31. *Id.* at 59.

32. *Id.* at 57, 64.

33. *Id.* at 65.

34. DOAC at p. 98.

Holiday Inn was totally unattended by and inaccessible to the hotel's employees.[35]

The Holiday Inn was finally wrested from Phalangist hands during fierce fighting between March 21 and 26, 1976. The Mourabitoun were reinforced by units of the Palestinian Liberation Organization ("PLO"), and by officers and men of the so-called "Lebanese Arab Army,"[36] who brought heavy military equipment to the task. Rockets and shells smashed into the building. The Phalangist defenders were killed in floor-to-floor fighting. By a ruse the Phalangists recaptured two floors of the Holiday Inn, but could not hold them, and the Phalangist reinforcements were wiped out in an armoured-car led assault the next day. During this fighting the Holiday Inn changed hands several times. By March 23, however, it was occupied by Moslem and Palestinian leftists.[37] "This time the Inn was properly and effectively garrisoned, and ceased to be fought over, though it was frequently used as a sniper position by Palestinians or Mourabitoun and made movement hazardous on the harbour road in East Beirut."[38]

## VI.

*Lebanon: Its Population, Parties, Leaders, and Neighbors.*

We must now step back from the immediate, physical causes of the damage to the Holiday Inn, and examine the historical, social and political context within which that violence took place.

Prior to World War I, present-day Lebanon and Syria, its neighbor to the north and east, were controlled by Turkey. Following the defeat of the Central Powers in the war, the Turkish Empire was redistributed. The area presently comprising Lebanon and Syria was detached from Turkey, and given to France for administration under Mandate by the League of Nations. The Mandate became effective in 1923, and ended in 1943. As the French withdrew, Lebanon in its modern political form emerged.

### (a) Population

In 1975 and 1976, the population of Lebanon was estimated to be in excess of 3½ million. Included among the native Lebanese, Christian and Moslem, were some 350,000 Palestinians who had come from other lands, in circumstances to be related *infra.*[39]

The Christian population consisted primarily of Maronites, Greek Orthodox, Greek Catholics, and other sects.[40] The Moslem population was divided among the Sunni, Shi'ite and Druze sects.[41]

### (b) Political Structures

The political system in Lebanon today is based upon both the written Lebanese Constitution and the unwritten, so-called "National Pact" entered into when France granted Lebanon independence in 1943.

The Constitution establishes a Republic and a secular state which is headed by a President who is elected by the Chamber of Deputies for a six-year term. The head of the government is the Prime Minister—sometimes referred to as the Premier—who is appointed by the President. Members of

**35.** R.A. 131.

**36.** Under the pressure of events in Lebanon, the Lebanese Army was breaking up. Ahmed Khatib, a Moslem lieutenant, led a breakaway movement in the Bekaa Valley and proclaimed himself head of the "Lebanese Arab Army." Bulloch describes what transpired in DOAC at p. 115:

"Whole garrisons and barracks followed his lead, arresting Christian commanders and replacing them with Moslems; at least forty tank crews defected to this new Moslem Army with their vehicles. At the same time, Christian units sided openly with the Right, so that the long-feared split in the Army, avoided in 1958, took place in 1976."

Eventually "the regular Lebanese Army itself was left as a rump force consisting mainly of headquarters' staff." *Id.* at p. 119.

**37.** DOAC at p. 124; R.A. 146.

**38.** DOAC at pp. 124–25.

**39.** R.A. 22.

**40.** R.A. 23.

**41.** DOAC at p. 26.

the Chamber of Deputies are elected directly by the people according to the electoral laws of the country.[42]

The National Pact provides that the President of the Republic must always be a Maronite Christian; the Prime Minister a Sunni Moslem; and the President of the Chamber of Deputies a Shi'ite Moslem. The National Pact also provides for proportional representation by Moslems and Christians in the Chamber of Deputies in accordance with a fixed ratio. The ratio is fixed on the basis of a population census of 1923, and provides for six Christian representatives to every five Moslem representatives.[43]

This allocation of political power along religious lines came to be known as the "confessional" system. It carried over into the Army, where the senior officer corps was predominantly Maronite Christian.

#### (c) *Political Leaders*

From 1970 until September 1976, the President of Lebanon was Suleiman Franjieh, a Maronite Christian. Elias Sarkis, another Christian, became President in September 1976.

Camille Chamoun, also a Christian leader, was President of Lebanon from 1952 to 1958. In addition, he was the founder and leader of the Party of Liberal Nationalists ("P.L.N."). In June of 1975, Chamoun became the Minister of the Interior. In this capacity he controlled Lebanon's Internal Security Forces ("F.S.I.") from June 1975 through the middle of 1976.

Pierre Gemayel was the leader of the Kataeb Party, also known as the Phalange (to which prior reference has been made), during the early 1970's.

Rashid Karami was a prominent Sunni Moslem leader who served as Prime Minister under President Franjieh from May 1975 through November 1976. Karami had been Prime Minister eight times prior to this appointment. As Prime Minister, Kar-

ami was the Commander-in-Chief of the Lebanese Army.

Kamal Jumblatt was a prominent Druze leader from the central mountain region of the Chouf. Jumblatt was the founder of the Progressive Socialist Party ("P.S.P."), and advocated the abolition of the sectarian system of representation in Parliament and public office. Jumblatt also served as the chief spokesman for the National Movement (see *infra*). He was assassinated in March 1977.[44]

#### (d) *Political Parties and Organizations*

In 1969 a confederation of left of center political parties was formed which bore the name "National Movement." The parties agree that the following identifiable organizations or groups were members of the National Movement:

The Progressive Socialist Party ("P.S.P.")

The Independent Nasserite Movement ("I.N.M.") or Independent Nasserite Organization ("I.N.O.") whose military arm was the Mourabitoun. They have been previously mentioned in connection with the damage to the Holiday Inn

The Lebanese Communist Party ("L.C. P.")

The Organization of Communist Action ("O.C.A.")

The Syrian Social Nationalist Party ("S.S. N.P.")

The Ba'ath Socialist Party (Syria): Lebanese Branch

The Ba'ath Socialist Party (Iraq): Lebanese Branch

The Arab Socialist Union in Lebanon ("A.S.U.L.")

The Union of the Forces of Working People—the corrective movement

The Populist Nasserite Organization ("P.N.O.")

The Arab Socialist Action Party

The Movement of the Disinherited (a predominantly Shi'ite organization which

---

**42.** R.A. 27.

**43.** R.A. 28.

**44.** The discussion under this subheading is derived from R.A. 31–36.

split with the National Movement in 1976)

The 24th of October Democratic Socialist Movement

The National Christian Front

Many of these parties, organizations or groups which comprised the National Movement had militia of varying sizes. From time to time, and in varying degrees, they had members of various religious persuasions. To the extent that generalizations are possible, and has previously been stated, the members of the National Movement were politically to the left of center.[45]

In 1975 and 1976 the chief spokesman of the National Movement was the Druze leader, Kamal Jumblatt. For three hundred years prior to the mid-19th century the Druze dynasties had controlled what is present day Lebanon. However, after a series of battles between 1840 and 1860, the Druze were gradually overcome by the Maronite Christians, who emerged as the dominant community, consisting themselves of seventeen officially recognized sub-communities or sub-sects. The Druze, smaller in numbers, ceded political power, but remained more powerful than their absolute numbers would have suggested. At the times pertinent to this action, Jumblatt was the leader of the Druze, and of the National Movement. Jumblatt was described by Jonathan Randal, the correspondent for the Washington Post in Lebanon at the time, who was called by Aetna to give deposition testimony:

"He was a king-maker in independent Lebanon. No president of the Republic was ever elected without his support, and very few presidents of the Republic ever got through their terms without finding Jumblatt a determined adversary." [46]

In describing the politics of Lebanon, one must guard against the simplification of labels. The phrase "National Movement" has a unified, solid sound to it. It is true that the component parts of the National Movement stood to the left of center. But among those component parts, there was wide diversity. The National Movement was described thus by Moussa Prince, a Beirut resident and lawyer called as a witness at trial by Aetna:

"It is a movement in which are grouped parties and tiny groups which go all the way from the ultrareligious up to and including the extreme left." [47]

Standing in general political opposition to the National Movement was the Lebanese Front, a coalition of predominantly right of center organizations whose principal objective was to maintain intact the *status quo* created by the National Pact of 1943, which I have previously described. The identifiable components of the Lebanese Front were as follows:

The Phalange (previously described)

The Party of Liberal Nationalists ("P.N. L."), the party founded by Camille Chamoun

Al Tanzim or the "Organization," a predominantly Maronite group

The Guards of the Cedars, an extremist right-wing organization particularly interested in the expulsion of all Palestinians from Lebanon

The Zghartan Liberation Army, a Maronite group centered in the Zgharta region of Lebanon. This group was organized by Tony Franjieh, the son of former president Suleiman Franjieh

The Permanent Congress of the Lebanese Orders of Monks, an organization of Maronite clergy [48]

Some of the parties, organizations and groups described *supra* were, at various times and in various degrees, allied with or influenced by foreign interests. But they were indigenous to Lebanon. We must also consider three foreign sources of direct impact upon Lebanon. These are the Palestinians, Syria and Israel.

---

**45.** R.A. 37–51.

**46.** Randal dep. at 39–40.

**47.** Tr. 153.

**48.** R.A. 53–59.

### (e) *The Palestinians*

The parties do not dispute much of the factual background regarding the Palestines in Lebanon.[49] "From 1948 onwards ... Palestinians fled from their homeland in the face of Israeli conquest or harassment, or merely through fear."[50] Some stopped first on the West Bank of the Jordan River; then, as that was overrun by Israelis, they moved into Jordan proper.[51] But many Palestinians came to Lebanon as a result of the fighting in 1948; and around Beirut "they formed a kind of necklace in a semi-circle going from West Beirut and the Mediterranean, in an arc around to East Beirut."[52]

The Palestinians who first settled around Beirut anticipated returning to Palestine soon. However, the years wore on, and that did not occur. The 1967 Arab-Israeli war inflicted a stunning defeat, in six days, upon the Arab armies. Prior to that time, the Palestinians in Lebanon were regarded as refugees. There was a heavy Lebanese police presence in and around the refugee camps. Few Palestinians were granted Lebanese citizenship. But in the aftermath of the 1967 war, with the Arab countries bewildered and cast down by their defeat, the Palestinians "remained as kind of a symbol of Arab purity and the refusal to accept that defeat." Concomitantly, in Lebanon a greater militancy arose on the part of the Palestinians, and a lessening of Lebanese government control. This period of time also saw the emergence of Yasser Arafat and his associates as the controlling force in the Palestine Liberation Organization ("P.L.O.").[53]

The P.L.O. had been established in 1964 by the Arab League. Its goal was the creation of a Palestinian state, if necessary by use of force. The P.L.O. established training camps and staging areas in Jordan, Syria and Lebanon. The Palestine Liberation Army ("P.L.A.") had originally been created as the purported military arm of the P.L.O., but by the 1970's the primary military arm of the P.L.O. in Lebanon was el Fatah, led by Arafat.[54]

In 1969, the P.L.O. entered into an agreement with the Lebanese government which gave the P.L.O. the right to establish armed units and training grounds within the refugee camps, provided that Lebanese sovereignty was respected and maintained. This was the so-called "Cairo Agreement" of November 3, 1969, pertinent portions of which appear in the margin.[55]

---

49. See R.A. 75–80.

50. DOAC at p. 2.

51. *Ibid.*

52. Randal dep. at 88. The witness added: "Some people have made the bad joke that the necklace turned out to be a choker."

53. Randal dep. at 88–89.

54. R.A. 75; DOAC at p. 49.

55. The Cairo Agreement appears in English translation in Khalidi, *Conflict and Violence in Lebanon: Confrontation in the Middle East,* Harvard University Center for International Affairs (1979) at pp. 185–187. The agreement recites preliminarily that:

"... In consonance with the bonds of brotherhood and common destiny, relations between Lebanon and the Palestinian revolution must always be conducted on the bases of confidence, frankness, and positive cooperation for the benefit of Lebanon and the Palestinian revolution and within the framework of Lebanese sovereignty and security."

The "Palestinian presence in Lebanon" was then "reorganized" on the basis of the following governing principles:

"1. The right of work, residence, and movement for Palestinians currently residing in Lebanon;

"2. The formation of Local Committees composed of Palestinians in the camps to care for the interests of Palestinians residing in these camps in cooperation with the local Lebanese authorities within the framework of Lebanese sovereignty;

"3. The establishment of posts of the Palestinian Armed Struggle inside the camps for the purpose of cooperation with the Local Committees to ensure good relations with the Lebanese authorities. These posts shall undertake the task of regulating and determining the presence of arms in the camps within the framework of Lebanese security and the interests of the Palestinian revolution;

"4. Palestinians resident in Lebanon are to be permitted to participate in the Palestinian revolution through the Palestinian Armed Struggle and in accordance with the principles of the sovereignty and security of Lebanon."

Syria refused to tolerate the use of its own territory as a base for direct infiltration of and attacks on Israel because of the threat of reprisals. By 1970, the P.L.O. presence in Jordan was significant and threatened the sovereignty of the Hashemite Kingdom. In September 1970 (so-called "Black September") the Jordanian Army began a series of operations which ultimately led to the expulsion of the P.L.O. from Jordan. After the expulsion of the P.L.O. from Jordan, Lebanon became the center of Palestinian operations against Israel.

As a result of guerrilla activities directed against Israel by Palestinian organizations operating out of Lebanon, Israel countered by making reprisal raids, principally in southern Lebanon. These raids drove significant portions of the predominantly Shi'ite population to urban areas, principally Beirut, and exacerbated the problems of poverty in and around the capital.

The reprisal raids also drove an increasing number of Palestinians into Lebanon and north to Beirut. The influx of Palestinians was opposed by the Maronites and many Sunni Moslems who feared that the Palestinian immigrants would be mobilized into an active force in Lebanese politics. Moslem and Christian nationalists opposed the presence of the Palestinians because they were seen as an affront to Lebanese sovereignty.

The Lebanese government was unable to oppose effectively the Israeli military power or to expel the P.L.O. militias as had been done in Jordan, because of the possibility of censure by other Arab countries and because of the support to the P.L.O. within the Moslem populace and the lower ranks of the army.[56]

### (f) Syria

Syria borders Lebanon on the north and east. It is ruled by the Ba'ath Party, which at the pertinent times was "run by the Alamite," a "break-away Shia sect."[57] Syria's president was Hafez Assad, a "pragmatic . . . leader who had brought stability to his country after twenty years of upheavals."[58] Syria was hostile to Israel, and critical of Egyptian president Sadat's accommodation with that nation in 1975.[59] The Israelis, in turn, "have made of the Syrians a kind of special devil."[60]

Syria's relations with the Palestinians play an important part in events. Prior to 1973, "the Syrians saw in the Palestinians a useful irregular arm of their own power, and so supported and supplied them, while at the same time trying to exert control through their domination of Saiqa, militarily the most powerful of the commando groups, which was under the direct orders of Syrian Army Intelligence."[61] But disenchantment with Egypt caused Syria's president Assad to think in terms of "the leadership of the whole Arab world."[62] This concept necessitated a Palestinian presence in Lebanon subject to Syrian control. The steps Syria took to implement that policy are discussed *infra.*

### (g) Israel

Israel is Lebanon's southern neighbor. At the pertinent times, Palestinian com-

---

There follows an agreement "to facilitate commando activity" by specified means. The agreement concludes:

> "13. It is understood that the Lebanese authorities, both civil and military, shall continue to exercise all their prerogatives and responsibilities in all areas of Lebanon in all circumstances;
> "14. The two delegations affirm that the Palestinian armed strugle [sic] is an activity in the interest of Lebanon as well as in that of the Palestinian revolution and all Arabs;
> . . ."

The Cairo Agreement was signed by General Emile Bustani, commander of the Lebanese Army and head of the Lebanese delegation, and by Arafat as head of the Palestinian delegation,

in the presence of the minister of foreign affairs and war minister of the United Arab Republic.

**56.** R.A. 77–80.

**57.** Randal dep. at 50.

**58.** Bulloch, DOAC at p. 5.

**59.** *Id.* at 4.

**60.** Randal dep. at 51.

**61.** DOAC at p. 4.

**62.** *Id.* at p. 5.

mandoes frequently raided Israeli settlements from bases in southern Lebanon. Israel would retaliate vigorously. One commentator suggests that Israel's attacks upon southern Lebanon, which did more harm to the relatively impecunious Shia inhabitants of the area than to the mobile Palestinians, were intended to polarize the factions in Lebanon, to the ultimate disadvantage of the Palestinian presence there.[63] Be that as it may, the strife on the Lebanese-Israeli border and the inability of the Lebanese Army to control the Palestinians or protect the Shia population from the Israelis constituted another source of growing unrest.

## VII.

### The Events of 1975 and 1976

Having considered the parties, organizations, persons, and nations involved, let us return to the events of 1975 and 1976.

The attitudes and objectives of the identifiable interests appear clearly from the evidence.

As for the Christian right—I use these labels *faute de mieux,* although they are not as precise as they sound—its main purpose was the preservation of the status quo.[64] That is perhaps understandable, since the National Pact of 1943 gave the Christians the presidency of the Republic and a six-to-five parliamentary majority in perpetuity. Over the succeeding years, "the Maronites in particular and the Christians in general had amassed a disproportionate share of the country's capital . . ."[65] The Christian factions also had the subsidiary aim of controlling or expelling the Palestinians,[66] since "if the Palestinians were not subjugated quickly, they would provide the muscle which the growing Leftist movement lacked."[67] The Palestinian

presence became a particular concern of the Phalange.[68,69]

Bulloch in his deposition testimony summarized the position of the right-wing groups:

"Q Did the Right announce any positions?

"A Their stated aims again were made at press conferences which I attended, and interviews, and publications.

"They wanted to establish the authority of the state by which they meant they don't want to have the Palestinians as the state within the state in Lebanon, as they saw it, and also opposed the Left-wing aims and wanted to maintain the status quo, that is, to continue the confessional system and to continue to have a Christian as the president of the country." Dep. at 141.

As for the left-wing groups, Bulloch testified:

"The Left-wing grouping announced several times, including by Jumblatt himself, in the press conference that I attended, that they wanted an overall change in the system of government in Lebanon, that they wanted to change the National Covenent, [sic] and in particular they wanted to alter the provision that the president should also be a Christian and they wanted to alter the six to five ratio.

"Various things like that.

"They wanted to enlarge the parliament to be divided equally between Christian and Moslem deputies to get away from the system of direct representation of various religious groups." Dep. at 140–41.

The basic purpose of the Palestinians in Lebanon was also described by Bulloch in his deposition testimony:

---

**63.** Bulloch, DOAC at p. 28.

**64.** Bulloch dep. at 313; deposition of Lucien George, Lebanon-born correspondent of the French newspaper *Le Monde,* called as a deposition witness by Aetna, at dep. 19–20; Randal dep. at 186–188.

**65.** DOAC at p. 2.

**66.** Bulloch dep. at 313.

**67.** DOAC at p. 4.

**68.** Bulloch dep. at 313.

**69.** George dep. at 22–23.

"Q Did the Palestinians voice any positions as to conditions in Lebanon?

"A The Palestinians' aim was to be allowed to carry on as they had been doing before in Lebanon. They didn't want to be involved in a war there.

"Their aim was to, their stated aim was to be allowed to go back to their homeland to establish their own state, and Palestinian leaders said on many occasions that they didn't want to be diverted from that by having to fight their Arab brothers in any other countries." Dep. at 143.

Bulloch expands on the Palestinians' situation in *Death of a Country,* a useful discussion that I quote at some length:

"The Palestinians, for their part, had no real desire to fight in Lebanon. Their leaders realized that the diplomatic gains of the past could all be lost if they became embroiled in Lebanese domestic politics or bogged down in a costly war. The Lebanon was not their home, nor did they want it as a new homeland. They were committed to the idea of returning to Palestine, of establishing a state there. To do that, they had to have a base and they knew very well that Lebanon was the last place left open to them. They had been brutally expelled from Jordan five years earlier, and the memories of that savage experience were still vivid. They had to preserve their one safe haven and they had to show that they could not be dominated or suppressed by anyone, least of all by the weak Lebanese State or the unofficial Phalangist Party." Pp. 41–42.

The positions of Syria and Israel have already been described. Syria opposed Israel, sensed its own star rising in the Arab world, and sought to control the Palestinians in Lebanon. In addition, Syria wished Lebanon to remain a base of operations for the P.L.O. because Syria did not want the P.L.O. operating from its own territory.[70] Israel sought to protect its northern boundary, and to discomfit the Palestinians in Lebanon.

These were the motivating attitudes of those involved with Lebanon at the beginning of 1975. Two additional factors are particularly worth noting. The first is that there were wide differences of opinion and allegiance between the groups which heretofore have been listed under the labels "right" or "left." The use of those labels derives from an almost inevitable journalistic or political shorthand; but they should not obscure the substantial degree of fragmentation in beliefs and objectives. A number of trial witnesses attest to this reality, which was particularly true of the interests on the left. Of those interests, Lucien George said:

"In order to achieve this change of system, there was a whole variety, a spectrum of positions, which went from reform with muscle to pure revolution." Dep. at 22.

And Bulloch, testifying at his deposition, described as accurate an article which he dispatched from Beirut on August 11, 1976, in which he wrote:

"On the Left the Palestinians are hopelessly split. The major group within the Palestine Liberation Organization, Fatah, would be willing to try to reach a compromise. But the organizations of the so-called Rejection Front want no negotiations at all, and in Beirut one man with a gun wrecks any cease fire. The left-wing alliance led by Mr. Kamal Jumblatt is just as divided. Mr. Jumblatt himself is a Druze, feudal landowner and clan chieftain bent on destroying the very system which allows him to exercise power.... Lebanon has always been a collection of feudal fiefdoms rather than a homogeneous state and even in the pseudo-sophistication of Beirut each neighborhood owed its allegiance to a family or a party rather than to a government." Dep. at 270–271.

A second significant factor had to do with the particular right-wing response to left-wing suggestions of political reform. That

---

**70.** R.A. 85.

reaction was extreme, and fed in large measure upon fear. Thus Randal testified:

"But such were the tensions within the society, especially seen from the narrow prism of the Maronite Catholics, that any change in the status quo was considered tantamount to revolutionary, and, as a result, this country went off the graph because nobody could say to the Christian Maronites: Stop it, you are not being asked to give away the whole farm. All they are asking for is this.

"Because they, through centuries of real and imagined and remembered suffering and persecution, had come to the conclusion that if they gave a fingernail away, it was all over." Dep. at 186–187.

These peoples, the products of this history, inhabiting this country, surrounded by these forces, were plunged almost inevitably, it would now seem, into the months of violence and destruction which give rise to the present litigation. And surely one must on occasion raise one's eyes from the fine print of the insurance policy and the legal precedents which govern the rights and obligations of HI and Aetna, and mourn the tragedy that has befallen this lovely country and its people.

But I return to my proper task. As described under Point V, *supra,* the fighting which first caused damage to the Holiday Inn occurred in October, 1975. During the earlier months of 1975, other violent incidents had occurred which, in part at least, helped set the stage for the fighting in the Kantari district of Beirut which involved the Holiday Inn and other hotels. The parties are in substantial agreement concerning the more prominent of these incidents, which will now be recounted.[71]

On February 26, 1975, a group of fishermen in Sidon began demonstrating against the establishment of a new company formed principally by Camille Chamoun which they viewed as a threat to their livelihood. Riots, demonstrations of sympathy and scattered violence continued through March 3, 1975. Political opinion became polarized over the Lebanese Army's role in these clashes. Certain members of the Moslem establishment accused the Lebanese Army of oppressing the workers. The Moslem establishment demanded a reorganization of the Army to give Moslems an equal participation in command. Members of the Christian community acclaimed the part played by the Army in upholding law and order. Both Pierre Gemayel and Camille Chamoun and their followers rejected the Moslems' demands for reorganization of the Army.[72]

On April 13, 1975, a bus with Palestinian and Lebanese passengers was ambushed by a group of armed Phalangists in retaliation for the assassination of two Phalangists and Gemayel's bodyguard earlier that day. Twenty-seven passengers were killed. This became known as the "Ain Rumanah" incident after the district through which the bus was travelling at the time of the attack.

These incidents triggered heavy fighting between Phalangist militias on the one hand, and National Movement and Palestinian militiamen on the other.[73]

---

**71.** The discussion of events prior to October, 1975 is derived from R.A. 87–92, 94–104, except where otherwise indicated in the footnotes.

**72.** Palestinian commandoes effectively supported the Moslems in the fighting at Sidon, which Bulloch regarded as significant: ". . . the Sidon events had shown the Palestinians in a new light: they had proved they were ready to help the Lebanese Left and the largely Moslem section of the poorest stratum of society in disputes which had nothing at all to do with the Palestinian movement as such." DOAC at p. 36.

**73.** Again, one must guard against the assumption that the militias were all formally structured or readily identifiable. Some were. But others operating in Beirut were described in his deposition by W. Nathaniel Howell, Jr., political officer in the United States Embassy at the time:

". . . it was almost impossible to identify, unless you knew a neighborhood, who the armed men in the neighborhood were. . . . Everyone controlled little areas of territory." Dep. at 22, 26.

George McMurtrie Godley, American Ambassador to Lebanon who was in Beirut from February 26, 1974 to January 13, 1976, described the situation thus:

Despite a cease fire agreement on April 16, 1975, sporadic machinegun and bazooka fire and bombings continued. The then prime minister, Rashid al-Solh, refused to declare a state of emergency or to order Army intervention.

On April 26, 1975, Jumblatt announced that he and his supporters in the National Movement would no longer participate in any government with representatives of the Phalange. On May 15, 1975, after further resignations from his cabinet, Solh resigned as prime minister.

On May 23, 1975, President Franjieh appointed retired Brigadier General Noureddine Rifai as prime minister to head a military cabinet. The military cabinet was immediately opposed by Rashid Karami and by Jumblatt. On May 26, 1975 Rifai resigned. Two days later, Karami was asked to form a cabinet.

In late June, fighting renewed between Maronites and P.F.L.P. commandoes in Zgharta, and between local Shi'ite and Maronite clans in the Baalbek.

On July 1, 1975, Karami announced his cabinet, which excluded representatives of the Phalange, as well as representatives of parties under the leadership of Jumblatt.

There followed a period of calm, or at least surface calm.[74] During that period, Jumblatt issued a public call for reform. Basically, he asked for the end of the allocation of political power along religious lines, not just executive but of the whole administration of government. Jumblatt did not accompany the program which he urged with any threat, explicit or implied.[75] Jumblatt's program consisted of a number of specific points, including a collegial command of the Army, replacing the Maronite command; a limitation upon the powers of the president and an increase of those of the prime minister; the election of the prime minister by the parliament, rather than his appointment by the president; a reform of parliament itself, which would cause the Christians to lose the majority of the seats that had been allocated to them in the National Pact of 1943; and greater equality in the civil service.[76] But nothing came of Jumblatt's suggested reforms.

"By the end of August 1975 the fighting had begun once again, and for all technical purposes did not stop until October, November 1976."[77] The fighting in the Kantari area of Beirut, which involved the hotel district and has been previously described, formed a part of this strife.

As recounted in detail under Point V *supra,* the fighting which damaged the Holiday Inn may be broken down into relatively identifiable times and phases. These are:

(a) late October, 1975: the Mourabitoun's assault upon the Murr Tower, with fire exchanged between the Tower, the streets, and the Holiday Inn and other hotels.

(b) November to December 6, 1975: intermittent hostilities, occasional exchanges of fire between hotels in rival hands.

---

"The military factions you might typify by what occurred around the Holiday Inn where you had at the outset, when I was there, Christians occupying Holiday Inn. You had Moslems wanting to take it. Holiday Inn was right, you might say, on the borderline between the predominantly Christian areas and the predominantly Moslem areas. There you had rather well-organized military factions where men were holding an area and other men were attacking it.

"The opposite end of the spectrum would be where you had these military organizations, paramilitary organizations, going around with sheer vandalism, hooliganism, robbery, destroying. There were many actions that we frankly could not classify.

"There would be nighttime murdering. No one would know who was doing it and to whom. Mortar shells would fall in an area killing people, destroying property. We could not really identify that. We would say the Christian area was mortared or the Moslem area was mortared. We assumed it was by the opposite, but we didn't know who was doing it." Tr. 577.

74. Randal dep. at 45.

75. *Id.* at 43–45.

76. George dep. at 23–25.

77. Randal dep. at 45. I suspect the phrase "for all technical purposes" should read "for all practical purposes."

(c) mid-December, 1975: greatly accelerated fighting subsequent to "Black Saturday" incident.

(d) late December, 1975 to late March, 1976: a return to intermittent fighting in the hotel district, the Phalange maintaining a redoubt in West Beirut which included the Holiday Inn.

(e) March 21–26, 1976: capture of Holiday Inn from Phalange by Mourabitoun, reinforced by P.L.O. and Lebanese Arab Army units.

The period between late December, 1975 and mid-March, 1976 was marked by two significant spheres of activity: political efforts to end the strife, and the interventions of Syria.

Again, much of what immediately follows has been stipulated by the parties in the Requests to Admit.

On December 15, 1975, fighting tapered off in Beirut after P.L.O. leaders worked out a cease-fire agreement with Moslem leftist groups. P.L.O. military police began to take over key Moslem positions in the downtown and hotel districts. The Lebanese Army set up liaison commissions in rightist held positions, including the Holiday Inn. Despite the cease-fire in Beirut, fighting continued in outlying areas.[78]

In middle and late December, representatives of the Syrian and Saudi Arabian governments, as well as the P.L.O., attempted to mediate the disputes. Some Moslem leftist groups, such as the I.N.M., were opposed to such attempts and turned to the Iraqi and Libyan governments for support. The December fighting marked the first involvement of militias controlled by conservative Moslem leaders such as Mr. Saib Salam, a former premier, in the disturbances.[79]

In early January, 1976, the Phalangists and P.N.L. attacked the two Palestinian refugee camps of Tel Zataar and Jisr al Pasha and blockaded the roads to the camps. Shi'ites from al Naba attacked the Phalangists in support of the Palestinian efforts to close the road.[80]

On January 6, 1976, Yasser Arafat announced that the P.L.O. would not tolerate the continuing siege of the two refugee camps and that it stood prepared to break it by force if necessary. Up to this point, the P.L.O. had remained inactive, despite military involvement by the various Palestinian splinter groups on the Moslem and radical leftist sides.[81]

On January 10, 1976 the Mourabitoun and other leftist forces reactivated the battle front in downtown Beirut in an effort to relieve pressure on the Palestinian camps. The Holiday Inn was reoccupied by Phalangist militiamen. Fighting continued on both fronts through January 14. By January 15, there were hostilities virtually everywhere in Lebanon. During the remainder of January 1976, the Moslem slums of Quarantina and Ashrafrya were captured after battle with Christian forces. The Christian towns of Damour, Saadiyat and Jiyeh were militarily taken by National Movement forces.[82]

In early 1976, the Lebanese Army began to disintegrate, with men deserting to join confessional groups or to go home.[83]

On January 18, 1976, Prime Minister Karami, having failed to impose a cease-fire, announced his resignation. On January 20, a Syrian delegation arrived in Lebanon to attempt the mediation of a cease-fire. On January 24, 1976, Prime Minister Karami withdrew his resignation when it appeared that most of the parties, with the exception of Mr. Chamoun, would support the Syrian mediation.[84]

On or about January 22, 1976 a cease-fire was entered into, which was policed in part

78. R.A. 127–128.

79. R.A. 130.

80. R.A. 132.

81. R.A. 133.

82. R.A. 134–136.

83. R.A. 137. See also n. 36, *supra*.

84. R.A. 138–139.

by PLA units and by remnants of the Lebanese Army and the Internal Securities Forces ("FSI"), which, like the army, had also begun to disintegrate along confessional lines.[85]

On February 14, 1976 President Franjieh announced a new National Covenant for Lebanon's political and economic system. This program provided for an equal number of Moslem and Christian deputies in the parliament, provided that prior restrictions on the activities of Palestinian organizations within Lebanon would be enforced, provided for certain modifications in the confessional basis in which certain government posts were awarded, and provided that the President was to remain a Maronite Christian. Various member groups of the National Movement criticized this new covenant, and Jumblatt refused to join the government of national unity which the new covenant contemplated.[86]

The split-up of the Lebanese Army, which had begun in late January 1976, accelerated over the next two months. New sectarian militias were formed, such as Lt. Khatib's Lebanese Arab Army. Many of the soldiers and lower ranks of officers joined the Lebanese Arab Army, while a sizable number joined the Phalangists, P.N.L., and President Franjieh's private militia.

On March 11, 1976, Brigadier General Aziz Ahdab, a Moslem military commander in the Beirut area, with some rightist support, announced the imposition of a state of emergency and called for the resignation of President Franjieh and his government. President Franjieh refused to resign. As demonstrated in greater detail *infra,* no substantive developments occurred as the result of Ahdab's action.

Beginning in late March, 1976, the Syrian government mounted diplomatic initiatives to establish a cease-fire. Finally, on April 9, armoured units of the regular Syrian Army entered Lebanon. Simultaneously, Syrian naval units began a blockade of ports used by the Moslem and leftist militias of the National Movement, and by Pal-

estinian militias (i.e., Tyre, Sidon, and Tripoli). A cease-fire was immediately agreed upon. On April 16, 1976, after a summit meeting in Damascus between Arafat and Syrian President Assad, the Syrian armoured units were pulled back from Lebanese territory. Fighting persisted in various parts of the country. On May 8, 1976 the Lebanese parliament elected Elias Sarkis to succeed Franjieh as President of the republic when the latter's term ended in September. After Sarkis' election, fighting between Christian militias on the one hand and Moslem, leftist, and Palestinian militias on the other hand continued.

On June 1, 1976, Syrian Army units crossed the Lebanese border and advanced on various fronts into Lebanon, thereby establishing a military presence in the country which remains to this day. Fighting among various factions continued, the Syrians aligning themselves against National Movement and Palestinian militias. It is not necessary to describe the fighting at this stage of events in any detail. Sarkis formally succeeded Franjieh as President of Lebanon on September 23, 1976. Ultimately Saudi Arabian leaders called a summit meeting of Arab countries in Riyadh to force Syria and the other parties to accept a cease-fire. The decisions reached at the Riyadh summit of October 1976 were accepted, and law and order began to return to most of Lebanon, at least for the time being. Of course, the years to come held much additional suffering for Lebanon, but those are facts beyond the scope of this litigation.

The preceding paragraphs, as the footnotes indicate, are drawn from the admissions forming a part of the record. Certain aspects must be considered in greater detail. One of these is the intervention of Syria in Lebanese affairs.

We have seen from the stipulated facts that Syria participated with others in December, 1975 in an unsuccessful attempt at mediation. Syria also participated in nego-

---

**85.** R.A. 137, 141.

**86.** R.A. 142–143.

tiations which produced the January 22, 1976 cease-fire, which persuaded Prime Minister Karami to withdraw his resignation. That cease-fire was policed by units of the Palestine Liberation Army ("P.L. A.").

The P.L.A. was controlled by the Syrian government. Its soldiers were Palestinians but the officers were Syrian, who took their orders from the Syrian general command.[87] In January, 1976 Syria sent the P.L.A. into Lebanon. It moved into Beirut and took up positions along the "Green Line," the recognized interface between Moslem west Beirut and Christian east Beirut. The P.L.A. tried to clear a zone on each side of the line to aid in reducing the fighting.[88] P.L.A. units also attempted to take over positions from various warring factions. In particular, in west Beirut the P.L.A. took over positions from Palestinian irregulars. Understandably enough, those irregulars at first greeted the Palestinian Liberation Army warmly, regarding its troops as having come in on their side. In point of fact, however, the P.L.A. had come in as a peacekeeping force on orders of the Syrian government, not for the purpose of assisting any particular faction to prevail.[89]

This Syrian-directed use of the P.L.A. in Lebanon in January, 1976 reflected a significant change in attitude on the part of Syria. Syria had originally assisted the National Movement on the left, and the Palestinians. However, by early December the Syrian government became concerned that a radical Palestinian-backed government was emerging from the continuing conflict in Lebanon. Syria did not want to live next door to such a regime.[90] Accordingly Syria took the risk, which one witness characterized as "enormous" of "switching sides even at the expense of eventually having to crush, not so much the left, but the Palestinians."[91]

Initially Syria hoped that the very thought of its taking such a position would bring about a cessation of the fighting. But that did not materialize. Syria then became increasingly concerned about what Israel would do. These circumstances prompted American Secretary of State Kissinger to act as an "honest broker" between the Syrians and the Israelis, suggesting to the latter that they should, together with Syria, prefer a Lebanese government in the hands of conservative Christians rather than one run by Lebanese leftist radicals backed by Palestinians. This suggestion bore fruit; Kissinger achieved a *modus vivendi* between Syria and Israel; and Israel did not react adversely when, in January, 1976, the Syrian-directed P.L.A. first entered Lebanon in an effort to keep the peace.[92]

At the same time, Syrian leaders sought to woo and restore importance to the traditional Sunni Moslem moderate leadership which had been weakened by the fighting. This effort represented another means of attempting to restore peace.[93]

As we know, these initial Syrian efforts to restore peace to Lebanon did not succeed. In Randal's view, the Syrians proved "remarkably inept."[94] The judgment seems harsh. While order was not immediately restored as the result of Syrian intervention, the prospects of that were surely remote, given Lebanon's recent history. In any event, divisive events continued. One of these was the final disintegration of the Lebanese Army into Christian and Moslem factions. Lt. Khatib, the Moslem officer who raised a mutiny in several garrisons, viewed his career as frustrated by the Mar-

87. Bulloch dep. at 76; Randal dep. at 52–53.

88. Bulloch dep. at 85–86.

89. *Id.* at 77.

90. Randal dep. at 49–50.

91. *Id.* at 50.

92. *Id.* at 51–52. In Randal's view, the Syrian presence in Lebanon took the form of Syrian-officered P.L.A. troops, rather than Syrian troops in Syrian uniforms, because American diplomats, in order to placate Israel, told Syria to keep the lowest possible profile. Dep. at 70.

93. *Id.* at 58.

94. *Id.* at 70.

onite military superstructure and set himself the objective of breaking up the army. He was manipulated in that regard by el Fatah, the mainstream P.L.O. organization. Khatib named the Moslem units that followed him the "Lebanese Arab Army." Its members gravitated toward a "conglomerate side," including at that point, moderate Sunni Moslems, leftist parties, and Palestinians.[95] In late January Khatib went so far that he "shot up a convoy of cars taking the Syrian foreign minister Khaddam back to Damascus." [96] As the army broke up, the Lebanese Arab Army obtained much artillery and heavy equipment. By March the national Lebanese army had "ceased to exist, either going to one side or the other." [97]

Another disappointment for peace lay in Jumblatt's previously noted rejection of President Franjieh's reforms, announced on February 14, 1976.

On March 11, 1976 General Ahdab made his televised demand for Franjieh's resignation. It is necessary to consider the Ahdab incident more closely. Ahdab and a few supporters seized the radio and television station in Beirut, "close to the hotel area where sporadic fighting was still going on," and "declared that he was taking over, called on President Franjieh to resign, and said a new government would be formed in a week." [98] Ahdab made a few follow-up announcements, but "[n]one of this had any effect at all. Franjieh ignored the whole thing and never even acknowledged that a move against him had been made." [99]

Ahdab's television appearance did apparently prompt a majority of the Lebanese parliament to ask Franjieh to resign. Franjieh refused to do so, encouraged in that refusal by Pierre Gemayel, the leader of the Phalange.[100] Ahdab's purported coup came to nothing. No one was following him.[101] He vanished back into the obscurity from which he had sprung.

But these events temporarily discouraged Syria's efforts at mediation. During January, February and early March a three-man Syrian delegation consisting of the foreign minister, the army chief of staff, and the head of the air force spent most of their time in Lebanon, "trying to talk out political settlement among the warring sides." However, following Ahdab's television performance "the Syrians threw up their hands and temporarily went home." [102]

Although the Syrian mediating team had withdrawn from Lebanon, the Syrian government continued its efforts. Various actors in the drama were directed to come to Damascus to be lectured; evidently they felt obliged to go. "Lieutenant Khatib had been summoned to Damascus for the moves 'his' forces were making against President Franjieh; then the conservative Moslem leaders, Karami, Salam and Assad, were called to Syria in their turn to be given instructions." [103] But for the time being, Syrian attempts to control events in Lebanon had clearly failed; and further violence mushroomed.

One incident, much referred to in the evidence at trial, involved another Lebanese Moslem officer, one Major Daher, who commanded a unit of the newly defeated Lebanese Arab Army. Although Khatib was of central importance to the army's disintegration, as to Moslem units other than his own "his direct control was minimal, as each unit formed an autonomous group which took orders from no-one." [104] Daher, who

95. *Id.* at 71–73; see also n. 36, *supra*.

96. Randal dep. at 71.

97. *Id.* at 72–73.

98. Bulloch, DOAC at p. 122.

99. *Id.* at p. 123.

100. Randal dep. at 78–79.

101. Bulloch wrote:

"Whatever the textbooks say, command of a television station alone is not enough; some forces capable of taking real action have to be deployed and Brigadier Ahdab had none available."
DOAC at p. 122.

102. Randal dep. at 76.

103. DOAC at p. 123.

104. DOAC at p. 122.

commanded a well-armed unit, also decided that Franjieh should resign. Operating with a sympathetic colleague, Daher directed two armored columns of the Lebanese Arab Army in a pincers movement against the presidential palace at Baabda. This occurred on March 15.[105] The columns' advance was blocked by P.L.A. and Saiqa units under the command of Syrians, who said they would not permit Daher's force to get through to the palace. But Daher was in artillery range, and on March 23 began a bombardment of the palace, where Franjieh was then resident.[106]

Another violent incident involved the Holiday Inn itself. I refer to the fighting between March 21 and 26 which finally wrestled the structure from the hands of the Phalange. Up to this time, the Phalange had used the Holiday Inn as "a strong point, a firing platform"; it was the right wing forces' furthest outpost in west Beirut, and important to their morale.[107] Over the prior six months the fire between the Phalangists and left wing forces had been "intermittent" and the latter's attacks upon the structure "desultory."[108] But now, launching "a new offensive ... following the failure of Syrian attempts to control events in Lebanon,"[109] the Mourabitoun were joined in their assault upon the Holiday Inn by Palestinians, particularly el Fatah, and by Lebanese Arab Army units with armored cars.[110] "[I]t was Khatib's Lebanese Arab Army that provided the Army;[111] it was the Fatah regular troops that did the fighting."[112] By March 26, as previously noted, the Phalange had been finally driven from the Holiday Inn, and it ceased to be a prominent object of strife.[113]

The failure of the Syrian negotiations, and Franjieh's refusal to resign also had an effect upon Jumblatt. Until then, the evidence before me shows Jumblatt had worked to reform the Lebanese governmental structure without uttering threats. Jumblatt appears to have laid considerable stress upon Franjieh's perceived inadequacies as president. As noted, Franjieh had announced his proposed political reforms on February 14. Jumblatt's note to Syrian foreign minister Khaddam rejecting the reforms was reported on February 28.[114] At this point Jumblatt's role was that of a politician, exploring political solutions. But when in mid-March Franjieh declined the parliamentarian's suggestion that he resign, Jumblatt "emerges from the shadows as the undisputed overall military, as well as political, leader of this combination side, and all of a sudden the cease fire collapses."[115] That is something of an exaggeration; the evidence makes it clear enough that life and lines of authority in Lebanon were so fragmented that nation-wide cease fires did not begin or end at the command of a single individual. However, Jumblatt's public pronouncements underwent a discernible change in March of 1976. He formed the so-called Fakhreddin Army, an exclusively Druze force named after a 17th century Druze leader, and began calling "for the

---

105. The date is derived from the New York Times News Index at p. 837. I may judicially notice such journalistic reports for chronological, non-controversial details. *Ope Shipping, Ltd. v. Allstate Ins. Co.,* 687 F.2d 639, cert. denied —— U.S. ——, 103 S.Ct. 1523, 75 L.Ed.2d 946.

106. Bulloch dep. at 111–112; DOAC at p. 123.

107. Bulloch dep. at 113, 175.

108. *Id.* at 113; DOAC at 124.

109. DOAC at 123.

110. Bulloch dep. at 113.

111. Thus in original. The context suggests "Army" should read "armor."

112. Randal dep. at 80.

113. As previously stated, HI claims under the policy for damages inflicted from October, 1975 to April 9, 1976. It is not clear from the record why the latter date was selected. No doubt the battered Inn received some further hits between March 26 and April 9, or even thereafter. But the damage for which HI seeks to recover had to all practical effect been inflicted by March 26.

114. New York Times Index at p. 836.

115. Randal dep. at 79.

overthrow of the system" [116] and for "war." [117] The precise timing of these pronouncements is not permitted by the evidence; the closest we can come is the press report on March 15 that "Jumblatt warns of leftist revolution if Franjieh does not resign." [118] At about this time Jumblatt's Druze followers began to fight with Christians in the Shuf, that mountainous region in southeastern Lebanon which had been the traditional Druze territory. [119]

Two qualifications must be made with respect to Jumblatt's position and pronouncements in mid and late March of 1976. The first is that he was entirely capable of exaggerated statements of accomplishment or intent. This is true of politicians everywhere, but perhaps more so in Lebanon than elsewhere. While in March Jumblatt was saying things like "I will drink Maronite blood from their very skulls," Randal, who testified to the statement, thought it right in his evidence to observe that "Jumblatt was a man who, among his other accomplishments, had something of the ham actor in him." [120] And Bulloch held the view that notwithstanding Palestinian and Druze belligerence in March, Jumblatt and Arafat preferred *au fond* a political compromise. Bulloch writes in *Death of a Country* at p. 127:

> "Yet Arafat and Jumblatt were both still prepared to compromise; Jumblatt, for all his inflammatory rhetoric, would still have settled for something very like the old Lebanon, so long as it was governed in accordance with his programme of relatively minor reforms aimed only at giving the Moslems of the country equal opportunities with the Christians. Arafat wanted an end to a war which was doing nothing but harm to the Palestinian cause and the return of conditions which would allow him to continue his basic struggle for the establishment of a State of Palestine."

In hopeful pursuit of those preferences, Jumblatt and Arafat "accepted a pressing invitation to visit Damascus," Jumblatt reaching the Syrian capital on March 28. [121] But nothing constructive came of the meetings. [122]

Secondly, to the extent that Jumblatt transformed bellicose words into action, he did so contrary to the advice of everyone else, particularly the Palestinians. Randal testified at p. 48 of his deposition:

> "A. Jumblatt kept saying, 'I am going to keep going.' Everybody else said, 'Stop, let's have a cease fire. This is going too far.'
>
> "Jumblatt's feeling in March 1976 was that he had bitten his teeth and he was determined to keep on going.
>
> "He refused to take the advice of his Palestinian allies, who were dragged into that campaign much against their wisdom. He refused to listen to the Syrians, literally with fatal consequences, and not just for himself."

(The phrase "bitten his teeth" appears in the transcript; it is likely the witness said "bit in his teeth.")

George testified that Jumblatt "pulled the Palestinians into battle." [123] Arafat, returning to Lebanon after the late March meeting in Damascus with Syrian president Assad, argued for a truce, in implementation of a policy of caution and restraint. But "this time neither Jumblatt nor the more extreme leaders such as Ibrahim Kleilat of the Mourabitoun would have anything to do with such a policy." [124] In these circumstances, and as previously recounted, regular Syrian forces entered Lebanon, first on April 9, 1976 and again on June 1; fight-

116. *Id.* at 46.

117. George dep. at 26.

118. New York Times News Index at p. 837.

119. DOAC at pp. 68, 123–24.

120. Randal dep. at 47–48.

121. DOAC at pp. 127–28.

122. *Ibid.*

123. George dep. at 26.

124. DOAC at p. 128.

ing finally stopped as the result of the Riyadh accord in October, 1976.

## VIII.

### The Question of Coverage Under the Policy

I now consider the question of whether Aetna has proved that the damage to the Holiday Inn falls within an excluded peril. Aetna argues for the applicability of three excluded perils: insurrection, civil war, and war. I examine them in turn.

### (1) *Insurrection.*

■ Under Judge Frankel's formulation, affirmed by the Second Circuit in *Pan Am,* "insurrection" for insurance purposes means "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." As noted under Point IV, *supra, Pan Am's* definition of "insurrection" is derived primarily from *Home Insurance Co. v. Davila, supra. Davila* speaks in terms of "maximum" and "minimum" objectives. A group may pursue both. Within the context of the Puerto Rican strife involved in *Davila,* the "maximum objective" would have been "the overthrow of the insular government, with a provisional Nationalist government in *de facto* control of the Island." 212 F.2d at 738. Chief Judge Magruder then offers this illuminating analysis:

"The minimum objective might have been to create a series of local disturbances, or 'civil commotions', in various towns of Puerto Rico, to embarrass and discredit the insular government, to dramatize the fact that there were 'patriots' in Puerto Rico prepared to die for the ideal of freedom, for propaganda purposes to fire a shot 'heard around the world'. If that objective, upon a more realistic appraisal of the possibilities, had been the only objective of the Nationalist leaders, then we would agree that the outbreaks of

October 30, 1950, did not constitute an 'insurrection' within the meaning of the particular insurance policies. But if the Nationalist leaders, however inept they might have been in their calculations and preparations, had also in mind the maximum objective aforesaid, then the uprising was an 'insurrection'; and no less so, as we have above indicated, even if reasonable men might conclude that this objective was not possible of accomplishment." *Ibid.*

My task is to apply these criteria, by which an "insurrection" is identified for insurance purposes, to the evidence adduced at trial. I am concerned with damage inflicted upon the Holiday Inn during the period October, 1975 through April 9, 1976. Events prior and subsequent to that period may be of some assistance in understanding events falling within those dates. But the case turns upon the relevant period; and the essential nature of the violent acts which turned the Holiday Inn from a functioning hotel to a wreck cannot be altered by events before or after those acts. In *Spinney's, supra,* Justice Mustill made that distinction within the context of the "civil war" exclusion. Justice Mustill was concerned with the destruction of insured commercial property in Beirut in January, 1976. He wrote:

" . . . I cannot find that by January, 1976, matters had advanced between massive civil strife and virtual anarchy to the stage of a civil war. *Perhaps they did later, but that is not for decision here.*" [1980] 1 Lloyd's L.Rep. at 432 (emphasis added).[125]

Under leading American authority, the test for insurrection is two-pronged: was there an identifiable "group or movement"; and, if so, did that group or movement have the requisite intent to overthrow the estab-

---

**125.** I do not cite the English court's judgment in *Spinney's,* on this point or any other, as precedent for findings of fact in my own judgment. That is because the evidence in the record of this trial constitutes the basis for this Court's findings, not the evidence adduced be-

fore another tribunal at a different trial. But I am free, as in the point of relevance under discussion, to accept Justice Mustill's legal analysis; or to adopt as useful his characterization of conditions in Lebanon if it conforms to the evidence in the trial before me.

lished government and assume at least *de facto* governmental control itself?

Applying these criteria to the facts revealed by the evidence, I find without difficulty that the earlier violence which damaged the Holiday Inn cannot be regarded as an insurrection. By "earlier violence" I mean the events from October, 1975 to mid-March, 1976, when the Holiday Inn was finally wrested from Phalangist hands. I will deal separately with those later events.

The first reported damage to the Holiday Inn, apparently relatively minor in nature, occurred in late October, 1975. That damage was related to the Mourabitoun's seizure of the Murr Tower during the attack on the Kantari district which began on October 25. Having seized the Murr Tower, the Mourabitoun and other leftist forces were able to fire upon the Holiday Inn and other Phalange-held hotels. By November 26, when the HI executive Reedijk was able to return to Beirut and inspect the Holiday Inn, the top-floor restaurant was not operational; a relatively small number of rooms had been destroyed or damaged; all guests had left; only a skeleton staff of hotel employees remained; and Phalangist militia occupied the Holiday Inn, using it as a shooting and observation platform, much as the Mourabitoun used the Murr Tower. This set the pattern for the next few months, until the leftists finally seized the Holiday Inn. The fighting would vary in intensity. Sometimes the firing was sporadic. At other times it would flare up, as in the aftermath of the Black Sunday incident in early December, when the last HI employees left the Holiday Inn, leaving the structure occupied only by Phalangists. It is a fair inference that during this period the Holiday Inn continued to receive incremental damage, although the precise amounts cannot be stated.

The contending forces' objectives during this period—late October, 1975 to mid-March, 1976—may fairly be summarized as efforts by leftist groups, primarily the Mourabitoun, to reduce the redoubt in Moslem western Beirut, centering on the hotel district, held by rightest groups, primarily the Phalange; and efforts by the latter to hold on to that redoubt.

These forces and these objectives do not constitute an insurrection. Neither prong is satisfied. Taking them in inverse order, no faction in this "hotel district" fighting can be identified as "acting for the specific purpose of overthrowing the constituted government and seizing its powers." The Phalangists and other right-wing groups cannot be so regarded. Their purpose was to preserve a status quo which favored their interests.

The Mourabitoun launched the Kantari attack, under the direction of the Independent Nasserite leader Kleilat, then (in Bulloch's phrase) in the process of transforming himself "from a back-street gangster into a politician." That perception, which I accept, does not square with Kleilat as the head of an insurrectionary government; and indeed there is no evidence that the Mourabitoun had such a far-reaching objective. Their objective was to expand that area in West Beirut over which they held control, at the expense of the Phalange. In the parlance of today's domestic gangs, they wished to enlarge their turf. Seizure of the Murr Tower—the immediate target whose capture led directly to the first destructive exchanges of fire with the Holiday Inn—was incident to that effort, nothing more, nothing less. The Mourabitoun were motivated against the Phalange by religious differences, economic inequities, and political distrust. These were the three causes of strife in Lebanon among the indigenous Lebanese factions (putting aside the Palestinians and the Syrians). But there is no evidence that the Mourabitoun or Kleilat, in initiating the fighting which engulfed the Holiday Inn, were attempting the overthrow of the constitutionally structured government of Lebanon, and to seize its powers.

I have found that, in their October, 1975 attack, the Mourabitoun were joined by some Saiqa militiamen and by fighters of radical Palestinian organizations. This does not change the analysis. The Saiqa was a "Palestinian organization controlled by Syr-

ia." [126]  Syria, as we have seen, was not at the pertinent times committed to the overthrow of the Lebanese government: quite the contrary.  Similarly, we have seen that the Palestinians, regarding Lebanon as their last safe haven, sought to avoid becoming "embroiled in Lebanese domestic politics." [127]  Whatever may have motivated those individuals who participated in this early fighting involving the Holiday Inn, it cannot be said that they then belonged to a group which had as its "maximum objective" the overthrow of the Lebanese government.

Thus this particular fighting may be characterized as an "insurrection" only if the immediate participants, who lacked the requisite intent, may somehow be identified with a larger group or movement which entertained that intent.  But it is not possible, on the evidence, to do that, and for two reasons.  The first is that labels such as "left," "right," "Christian" and "Moslem" suggest a degree of cohesion and unity of purpose which did not exist.  I have previously referred to this point.  Politics and the social order in Lebanon were fragmented.  Politicians and military leaders did not exist in the western democratic sense.  I do not say this in a pejorative manner; my only purpose is to convey the reality of Lebanon.  The major figures—men like Gemayel, Chamoun, and Jamayel—were part modern politicians, part feudal barons, part generals, part religious leaders.  Their constituencies and militias were intensely personal.  The lesser political figures—such as Franjieh, Karami, and Sarkis—held office in large measure at the sufferance of the leaders of the major private constituencies.  And there was a myriad of lesser groups, loyal to relatively minor individuals.  The Mourabitoun, headed by Kleilat, furnish an example.  Unifying political themes—Republican and Democratic, Conservative, Labor and Liberal—were missing in Lebanon.  George Godley, United States Ambassador to Lebanon from February,

1974 to mid-January, 1976, testified that "no two Lebanese agreed on politics without forming a new political party." [128]  This may be something of an exaggeration, but it captures the Lebanese experience accurately enough.  Political fragmentation was closely mirrored by the military structure (or lack of it).  Bulloch wrote that Lebanon "was the stomping ground of more than 40 private armies, engaged in free-for-all battles over turf, power and money."  Parties to Lebanese violence frequently included a "melange of feudal lords, Mafia dons, religious zealots, modern totalitarians, intellectuals, the defenders of hearth and home and people who simply [had] nothing better to do." [129]  And it follows that groups cannot accurately be placed under labels which suggest cohesion or unity of purpose.  On the evidence before me, I adopt Justice Mustill's useful discussion in *Spinney's, supra*, at 416:

" . . . many commentators have been forced, in the interests of brevity, to employ composite expressions such as the 'Christian right' and the 'Moslem left', and indeed I will do so in this judgment.  While these provide a useful shorthand, I am satisfied that they represent a great over-simplification of the complexities of Lebanese politics—at least if they are understood as conveying that to be a Christian in the Lebanon is necessarily to have politics of the 'right'.  No doubt a majority of Christians would be found to share a majority of the opinions loosely labelled 'right-wing'.  But the religious and political orientations did not necessarily run side by side.  I do not doubt that there were those of conservative cast who were non-Christians; conversely with the 'left', which had many supporters who were not Moslem, and included important groups of an exclusively political and non-confessional character.  Moreover, the terms tend misleadingly to suggest a degree of unity which was not

126.  Bulloch dep. at 36.

127.  DOAC at p. 41.

128.  Tr. 569.

129.  The quotations are from Bulloch's news dispatches, Def.Ex. 4 to his deposition.

present, since elements lying on the same side of the rough division between 'Christian left' and 'Moslem right' would often be sharply at odds with one another: not only on matters of internal politics, but on the larger question of the part which Lebanon should play in the modern world. Again, the Palestinian organisations, themselves far from being in mutual accord, cannot accurately be identified with the indigenous Lebanese radicals."

Because all this is so, no basis exists for imbuing the actual participants in the fighting which damaged the Holiday Inn with an insurrectionary intent that might have been harbored by other factions of a general, "leftist" persuasion.

In point of fact, however, no general insurrectionary intent is demonstrated at this time. To the extent that there was an identifiable grouping of the left,[130] it was the National Movement, with Jumblatt as its chief spokesman;[131] and Jumblatt, at least prior to mid-March, 1976, remained committed to the political process of reform.

In April, 1975 Jumblatt and his supporters said that they would no longer participate in any Lebanese government with representatives of the Phalange. But that is not a declaration of insurrectionary intent to overthrow the constitutional government, any more than is the refusal of a particular political party to serve in a proposed coalition government. The Karami government formed in July, 1975 excluded both Phalangists and Jumblatt supporters. During the ensuing temporary calm, Jumblatt issued his call for reforms, unaccompanied by any threats. The reforms were not accepted by those who favored the status

quo; but Jumblatt had not changed his political posture from reformer to insurrectionary at the time of the earlier fighting which damaged the Holiday Inn occurred.

In sum, prior to the events of mid-March, 1976 there is no basis for contending that the Holiday Inn was damaged by the actions of an identifiable group or movement whose purpose was to overthrow the constituted government and seize its powers. I am led to that conclusion not only by Aetna's failure to sustain its burden of proving either necessary criterion of an "insurrection," but also by the considerable evidence in the record negating the existence of those criteria. To the evidence already discussed I add the testimony of Ambassador Godley, who was the United States' envoy to Lebanon, resident in Beirut, from February 26, 1974 to January 13, 1976 (see n. 73 *supra*). Godley said of the period of his service:

" . . . as of the time we were out there we did not refer to it knowingly with responsibility as a civil war. We couldn't help but note that you had a central government, or the vestiges of a central government, still in operation, and as far as we were aware we could not identify any important element that was seeking to overthrow that central government. Most of the elements wanted, I think, for the central government to continue. Many of them wanted to see it modified in some manner, but I don't ever recall anyone saying, 'We have to throw out these rascals,' or 'We have to change dramatically the structure of the Lebanese Government.' " Tr. 597–98.

Godley was responding to a question about a "civil war" in Lebanon, but having in

---

**130.** I need not further consider the objectives of the right-wing groups, except to observe again that they were in the main devoted to preserving the governmental status quo, and hence cannot be regarded as insurrectionary.

**131.** While HI and Aetna agree that Jumblatt should be so characterized, again one should not infer a unity of mind and purpose that did not exist among the National Movement parties. Justice Mustill said in *Spinney's* of the leftist parties in *Spinney's* at 431:

"For all that Mr. Jumblatt appears on occasion to have been presented as their spokesman, he was a point of intersection of converging views rather than the leader of a united front."

The evidence in the case at bar points to the same conclusion. Jumblatt had firm control over, and could speak authoritatively for, only the Druze.

mind the requisite intent, his answer is equally probative on the existence *vel non* of an insurrection.

Godley had prefaced that testimony with his impression of the nature of the fighting in progress at the time:

" . . . we did know that your die-hard, your extreme Christian, wanted to kill Moslems the saye [sic] way the Moslems, the die-hard Moslems, the extremists, wanted to kill Christians. By that time, thinking back on it as I have been, we, ourselves, were very, very confused in that nobody could clearly be identified. "Earlier, there was a mention that Kamal Jumblatt had seven points. I don't think that the majority of the people shooting at Christians would have said, 'I'm doing this for Kamal Jumblatt's seven points.' "We would always ask ourselves, 'Why are these people risking their lives, their fortunes, their businesses, in this fracas?' "The best answer we could come up with was that it was sort of an inheritance. I mean we here in this court, we have in this country the fighting in the Kentucky Mountains where the McCoys and the Hatfields have been fighting for generations. There is a lot of that in the Lebanon.

"We have had this conflict, we have had this strife, and suddenly the lid blows off. By golly, we can go out and shoot people—so they go out and they shoot people.

"Added to this tragic situation was sheer vandalism, robbery, and with the disappearance of authority the unruly elements were able to come to the surface. Some of them could commit robbery in the name of a supposedly recognized political organization. Others just went out and committed robbery for the sake of robbing." Tr. 580–82.

To his knowledge, no group or faction was seeking to overthrow the Lebanese government.[132] A wholly disinterested witness called by HI, Godley's evidence on this point is to the same effect as Aetna's equally disinterested witnesses, the journalists Bulloch, Randal, and George.

Aetna's brief (p. 46) seeks to dismiss Godley's testimony as "based on insufficient knowledge, experience, background and study." I do not agree. Godley is not an amateur diplomat, rewarded for campaign contributions to the political party in power. He was a professional foreign service officer since 1941. After holding lesser positions, he served as director of the State Department's Office of Central African Affairs (1962–1964), Ambassador to the Congo (1964–1966), and Deputy Assistant Secretary of State for East Asian and Pacific Affairs (1968–1973), before being posted to Lebanon. Godley was experienced in sensing and reporting upon the affairs of troubled parts of the world. If while Ambassador in Beirut he and his staff "could not identify any important element that was seeking to overthrow [the] central government," that is persuasive evidence that no such group with that specific intent existed.

Godley left Lebanon in mid-January, 1976, for health reasons. But the other evidence to which I have referred demonstrates the continuing validity of his observation that no "important element" was seeking to overthrow the central government. It must of course be recognized that as 1976 began President Franjieh was coming under increased criticism from many quarters. However, the key question in Lebanese affairs during these months remained whether an accommodation and lasting cease-fire could be achieved politically, through suggested reforms of the existing system possibly including a presidential resignation, a species of political reform not unknown in recent American history. As previously noted, in February, 1976 Franjieh announced a new national covenant with modifications of the confessional allocation of power. Jumblatt refused to agree to Franjieh's suggested reforms because he regarded them as inadequate. In April, 1975 those who favored the status quo had rejected Jumblatt's suggested reforms as too extreme. The point is that throughout this period, the leaders of the

**132.** Tr. 583.

principal contending groups were attempting to restructure the Lebanese political system, not destroy it. No group can be identified as intending to put an end to the constituted government and seize the machinery of government for itself.

That is true, notwithstanding Brigadier Ahdab's television appearance in early March, 1976. Ahdab's public pronouncements might at first blush appear to satisfy the *Pan Am* criterion of insurrectionary intent. But no one responded to Ahdab's proclamation that the government was abrogated. Franjieh paid no attention. Certain parliamentarians suggested that Franjieh resign, but subsided when he did not. Ahdab's performance was pure Glendower.[133] Although under *Davila* a group's objective of overthrowing the government may be insurrectionary even if "quixotic," there must still be an identifiable group. As a practical matter, Ahdab marched alone and no one came when he called for them. Nor is there any evidence that his action caused, directly or indirectly, any of the fighting which damaged the Holiday Inn.

I come, then, to the latter half of March, 1976. Fierce fighting involved the Holiday Inn between March 21 and 26. During that period the Phalangists were driven from the inn by the Mourabitoun, assisted by Palestinians from Fatah and heavy equipment furnished by the Lebanese Arab Army. Significant additional damage was inflicted on the structure. The parties do not suggest, at least in their submissions to date, that an allocation of damages according to particular periods of time is possible. The policy excludes damage "contributed to" by an excepted cause. If circumstances in Lebanon changed in mid-March, to bring about a more cohesive structure and that specific intent to overthrow the government which is a prerequisite to a state of "insurrection"; and if the later fighting over the Holiday Inn "directly or indirectly, proximately or remotely" arose out of an insurrection; then Aetna may plausibly argue that the entire claim fails, under the particular exclusion language in the policy.

Jumblatt is the key to the argument. "[B]y the spring of 1976 he was calling for the overthrow of the system, physical overthrow of the system," Randal testified. "There was no turning back, after he decided in March, 1976, to move ahead with the war, at a time when both his Christian adversaries and his Palestinian allies were telling him to compromise."[134] As noted, on March 15 Jumblatt warned of a "leftist revolution" if Franjieh did not resign.[135] If Jumblatt's call for the physical overthrow of the system accurately reflected his intent, and if the fighting over the Holiday Inn in late March constituted a response to that call and an attempt to further that intent, a defense might be made out.

This line of argument is, in my view, the only one available to Aetna on the evidence. It is a reasonable interpretation of events in Lebanon at this particular time. But there are other reasonable interpretations available.

One is that Jumblatt's pronouncements were largely "inflammatory rhetoric," his real objective being "something very like the old Lebanon," altered only by "relatively minor reforms aimed only at giving the Moslems of the country equal opportunities with the Christians." At least that was Bulloch's view of Jumblatt as expressed in his book, from which I have previously quoted. That is a limited objective, more consistent with that of recent social legislation in this country than with the "maximum objective" of government overthrow articulated in *Davila* as the essential element of insurrection.

Alternatively, Jumblatt may have meant everything he said in mid-March, but not have motivated those who stormed the Holiday Inn during March 21–26. That violence was a direct continuation of the Mourabitoun's effort to reduce the Phalange's

---

**133.** "*Glendower:* I can call spirits from the vasty deep.

   "*Hotspur:* Why, so can I, or so can any man; But will they come when you do call for them?"

*Henry IV,* Part I, III, i, 53.

**134.** Randal dep. at 42–43.

**135.** See text at n. 118, *supra.*

redoubt in west Beirut. Kleilat, the Mourabitoun leader, had his own separate persona and following. There is no compelling evidence in the record that Kleilat or the Mourabitoun were acting in response to Jumblatt's pronouncements, or seeking to overthrow and replace the constitutional Lebanese government.[136] That was true of the earlier events, when the battle for the Kantari district began. It is equally true of the events in late March, 1976. It is at least equally reasonable to conclude from the evidence that Kleilat and his followers were at all pertinent times motivated not by an intent to do away with the Lebanese government and assume its powers, but by the much more modest objective of pushing the Phalange (a rival militia which cannot be equated with the government) out of a particular section of the city of Beirut. That is not an insurrectionary intent, under the cases.

The Mourabitoun were assisted in their capture of the Holiday Inn from the Phalange by Palestinians from Fatah and equipment from the Lebanese Arab Army. The presence of these forces do not foreclose a reasonable interpretation of something other than insurrectionary intent. The Fatah was Arafat's constituency. All the evidence is that Arafat wished to avoid confrontation with the Lebanese government or involvement with the country's politics. The participation of Fatah fighters in the final assault upon the Holiday Inn is equally consistent with a Palestinian reaction to the Phalange's attacks in January upon the Palestinian refugee camps.[137] While the disaffected Lebanese Arab Army made equipment available to the Mourabitoun and the Palestinians, it was (on this interpretation of the evidence) in aid of an objective that cannot be characterized as insurrectionary.

What it comes down to is this. "From the welter of conflicting evidence, reasonable men might draw any of a number of conflicting conclusions," *Pan Am* at 1018, about whether at least some of the damage to the Holiday Inn was caused by those acting with "the crucial element" of intent to overthrow and replace the government of Lebanon. *Id.* at 1019. But I am not required to choose among these possible interpretations. Under *Pan Am*, it was Aetna's burden to prove that crucial element of intent. Aetna has not sustained that burden. Its defense based upon the exclusion of "insurrection" fails.

### 2. *Civil War.*

If the analysis in *Pan Am* is strictly followed, Aetna's failure to prove the existence of an insurrection is equally fatal to its defense based upon "civil war." The Second Circuit said in *Pan Am* at 1017:

---

136. Aetna cites Ambassador Godley for testimony that "on March 21, 1976 Jumblatt 'announced that a total and irreversible military campaign would be waged' by the National Movement and its allies." Main Brief at 54. In point of fact, Godley did not testify in those words. Counsel for Aetna read to Godley excerpts from a book by one Professor Khalidi, *Conflict and Violence in Lebanon*. Khalidi was a Palestinian. Godley at Tr. 641. Counsel read to Godley this passage from p. 55 of Khalidi's book:

"Political developments were overtaken by military developments. On the 21st of March, upon Jumblatt's announcement that a total and irreversible military campaign would be waged, the National Movement, now backed by Khatib's armor and artillery, as well as by Palestinian militiamen, opened a major offensive in the Beirut hotel area and penetrated deep into Phalangist-held territory."
Tr. 644–45.

Although Godley said he "would not quibble" with this account, Tr. 645, it has no probative value, since Godley had left Lebanon by this time and had no personal knowledge of the events, and Professor Khalidi (unlike that other author of a book about Lebanon, Jonathan Bulloch) was not called as a witness. Therefore I can give no weight to the suggestions in Khalidi's book that the "National Movement" opened an offensive in the hotel area on March 21, and did so in response to Jumblatt's announcement. It was the Mourabitoun who, with assistance, captured the Holiday Inn from the Phalangists; and the Mourabitoun's objectives cannot be safely equated with those of the National Movement (assuming that the objectives of the latter can be sufficiently identified). The Mourabitoun "came out of the woodwork" as a "bunch of gangsters," although with increasing strength they became a political force. See also text at fn. 9, *supra*.

137. See text at n. 80, *supra*.

"In the district court the all risk insurers relied on every term in clause 2 except 'invasion.' Thus, aside from 'war' and 'warlike operations,' they claimed that the loss was excluded from coverage by each of 'civil war,' 'revolution,' 'rebellion,' and 'insurrection.' Their efforts soon focused on the last of these terms, because all parties agreed that if the loss was not caused by an 'insurrection,' then it could not have been caused by any of the other clause 2 terms relating to civil disorders. *'Insurrection' presents the key issue because 'rebellion,' 'revolution,' and 'civil war' are progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.'* See *Home Insurance Co. v. Davila,* 212 F.2d 731, 736 (1st Cir.1954); cf. *The Brig Army Warwick (The Prize Cases),* 67 U.S. (2 Black) 635, 666, 17 L.Ed. 459 (1862)." (emphasis added).

Aetna argues that this proposition "that insurrection, rebellion, revolution and civil war are simply progressive points on the same line" was agreed upon by counsel in *Pan Am;* that Aetna does not agree; and that on a proper construction of its opinion, "[t]he meaning of the term 'civil war' was not addressed by the Second Circuit in the *Pan Am* case." Main brief at 33–34.

I do not read Judge Hays' opinion that way. It is apparently true that counsel for the parties in *Pan Am* agreed on the proposition in question. But the Second Circuit was free to accept or reject the concept. In my view, the court accepted it in the italicized sentence in the passage I have quoted. Judge Hays' opinion does not simply recite a stipulation of counsel. It cites *Davila* and *The Brig Army Warwick (The Prize Cases),* 67 U.S. (2 Black), 635, 666, 17 L.Ed. 459 (1862) as authority. That is appropriate enough, since *Davila* quotes the following language from *The Prize Cases:*

"Insurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government. A civil war is never solemnly declared; it becomes such by its accidents—the number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory; have declared their independence; have cast off their allegiance; have organized armies; have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a *war.*" 67 U.S. (2 Black) at 666–67 (emphasis in original).

And, in the Supreme Court opinion, this language immediately follows:

"*They* claim to be in arms to establish their liberty and independence, in order to become a sovereign State, while the sovereign party treats them as insurgents and rebels who owe allegiance, and who should be punished with death for their treason." *Id.* 67 U.S. (2 Black) at 667 (emphasis in original).

Aetna points out, correctly, that the *Prize Cases* decision did not construe an insurance policy. The issue was whether a "war" was in progress between the Union and the Confederacy, thereby justifying President Lincoln's blockade and seizure of ships under recognized principles of international law. The distinction may be conceded, but international law appropriately "provides a starting place for our inquiry" into insurance law. *Pan Am* at 1012 n. 12.

This Court, in two more recent cases concerning the Sandinista uprising against the Somoza government in Nicaragua, followed the quoted language from *Pan Am* as a holding by the Second Circuit on the definition of "civil war" for insurance purposes. *Wilker Brothers Co. v. Lumbermen's Mutual Casualty Co.,* 529 F.Supp. 113, 116 (S.D.N.Y.1981); *Ope Shipping, Ltd. v. Allstate Insurance Co.,* 521 F.Supp. 342, 349 (S.D.N.Y.1981).

In these circumstances, I regard the quoted language from *Pan Am* as a holding on the insurance meaning of "civil war." Furthermore, that is a definition of which Aetna had at least constructive knowledge at the time it entered into the policy in suit.

It follows that Aetna's failure to prove the requisite intent for an "insurrection" dooms its effort to defend on the theory of

"civil war." The intent of participants in an insurrection is "overthrowing the constituted government and seizing its powers." That is, as the Second Circuit aptly observed in *Pan Am,* a more "rudimentary" form of intent than that which motivates participants in a civil war. The latter individuals, as described by the Supreme Court in the *Prize Cases,* "have declared their independence; have cast off their allegiance;" and "have commenced hostilities against their former sovereign;" they "claim to be in arms to establish their liberty and independence, in order to become a sovereign State..." And the "sovereign party" thus threatened "treats them as insurgents and rebels who owe allegiance, and should be punished with death for their treason." These expressions of intent and purpose were, not surprisingly, found by the Court to exist during the American Civil War.[138]

Applying the *Pan Am* definitions, a "civil war" was found to exist in Nicaragua during 1978 and 1979 by Judge Pollack in *Ope Shipping, supra,* and by Judge Brieant in *Wilker Brothers Co., supra.* The incumbent government was that of General Somoza. Somoza, a dictator, constituted the entire government. There was no president, prime minister, parliament or constitution in any meaningful sense. In consequence, when the Sandinista National Liberation Front undertook activities in 1978 to "oust General Somoza"; declared publicly on June 1, 1979 that "the hour for the overthrow of President Somoza has arrived," and called for "insurrection," with fighting thereafter breaking out in the principal cities; and named "a provisional government of five leaders (a Junta)" on June 18,[139] a civil war was clearly under way. Somoza's person and the sovereign Nicaraguan state were synonymous. Depose one, and you depose the other. In these circumstances, this Court held that insured vessels owned by Somoza, seized by revolutionary crew members in June, 1979, and turned over to the revolutionary government "which came into power on or about July 20, 1979," *id.* at 344, were lost to their assured owners as the result of "civil war," so that the policy exclusion applied.

Judge Pollack in *Ope Shipping* observed that "[t]he relevant history of the civil war during that period is also chronicled (in part) in *Productos Carnic, S.A. v. Central American Beef & Trading Co.,* 621 F.2d 683 (5th Cir.1980), where the Fifth Circuit said at 685:

"Insurrection, armed conflict, battles in the street, terrorist attacks, riots, war, revolution, and the overthrow of a dictator permeate this appeal. General Anastasio Somoza was forced to resign as President of Nicaragua on July 17, 1979. The new government promptly national-

---

**138.** Aetna relies in its briefs on a subsequent statement in the *Prize Cases,* 67 U.S. (2 Black) at 667–68:

"The true test of its existence, as found in the writing of the sages of the common law, may be thus summarily stated: 'When the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the Courts of Justice cannot be kept open, *civil war exists* and hostilities may be prosecuted on the same footing as if those opposing the Government were foreign enemies invading the land.'"

Aetna interprets this language to mean that if the law courts are closed, it must be a civil war, and contends that the courts in Beirut were in fact closed by the fighting. The evidence on the point is in conflict, but in any event I cannot agree that the Supreme Court intended this single factor to be determinative, particularly in view of its recitation of other factors several paragraphs earlier. The same language from the *Prize Cases* was cited to

Justice Mustill in *Spinney's,* who declined to find a civil war in Lebanon. I agree with his analysis, at 429:

"... the learned Judge cannot properly be understood as laying down a test which would hold good in all circumstances for all time, and which can be applied directly to the words wherever they appear in a contract: for such a test would manifestly be too narrow."

**139.** The quotations are from *Ope Shipping, supra,* at 345. Judge Pollack relied for those declarations, acts and dates upon the New York Times Index "for the chronology as a backdrop to better understanding of the evidentiary data in the trial record—a chronology from sources whose accuracy so far as set forth herein cannot reasonably be questioned. See Rule 201, Federal Rules of Evidence." *Id.* at 344. I have in the case at bar made a comparable use of Rule 201.

ized a great portion of the vast holdings of Somoza and his family, including a small Nicaraguan meat processing company—already close to bankruptcy—Productos Carnic, S.A."

In *Wilker Brothers, supra,* Judge Brieant applied the "civil war" exclusion to damage to the assured's Nicaraguan factory during July, 1979, before the conclusion of the strife resulting from the efforts to change the Nicaraguan government. 529 F.Supp. at 115. The Court characterized events in Nicaragua as follows:

"The change of administration in Nicaragua occurred as a result of a civil war or insurrection, as a result of which the Sandinistas, with a little help from their friends (in Washington, D.C. and elsewhere) procured the overthrow of the government after a considerable amount of civil commotion and street fighting." *Id.* at 113.

Two English insurance cases prior to *Spinney's* deal with "civil war." In *Pesquerias y Secaderos de Bacalao de Espana, S.A. v. Beer,* 1 All E.R. 845 (H.L.1949), aff'g. 80 Lloyd's List L.R. 318 (C.A.1947), rev'g. 79 Lloyd's List L.R. 417 (K.B.1946), insured vessels were taken by a Basque militia which remained loyal to the Republican government of Spain. The vessels were used for armed patrol purposes and to transport refugees. These actions were taken in response to the approach of the army of General Mola, whose troops had risen in insurrection at the call of General Franco. Franco had landed in Spain and issued "a declaration of war against the Republican government"; the aim of Franco and his followers "was to overthrow the Government of the Republic by force of arms." Judgment of Lord Greene, M.R., for the Court of Appeal, at 80 Lloyd's List L.R. 323, 324 (C.A.1947). The Court of Appeal held, and the House of Lords agreed, that a "civil war" fell within the excluded peril "war-risks," and that what was happening in Spain constituted a "civil war."

Four of the law lords in *Pesquerias y Secaderos* construed the Court of Appeal's decision in *Curtis & Sons v. Mathews,* [1918] 2 K.B. 825, aff'd. [1919] 1 K.B. 425 (C.A.

1918) as holding that events during the 1916 Easter rising in Dublin constituted a "civil war." So construed, the House of Lords in *Pesquerias y Secaderos* approved the Court of Appeal's holding in *Curtis & Sons.* 1 All E.R. at 847 (H.L.1949). In *Curtis & Sons* various persons proclaimed a Provisional Government of Ireland, occupied public buildings in Dublin, claimed the support of "gallant allies in Europe" (the Central Powers were then at war with the United Kingdom), and did battle with military forces of the Crown, during which insured property was damaged.

Neither of these cases undertakes to define in detail what a "civil war" is for insurance purposes. But the facts fit the pattern of American authority. Franco and his followers in Spain and the Irish rebels of the Easter rising have in common with the American Confederacy and the Nicaraguan Sandinistas a casting off of all allegiance to the established government, a proclamation of a new government, and the waging of war to oust the former and establish the latter.

In *Spinney's, supra,* Justice Mustill concluded on the evidence before him that a civil war did not exist in Lebanon in January, 1976. At point in his judgment, Judge Mustill appears to adopt a rationale different from the other cases, American and English, that have considered the point. He says at 430:

"But where the term is used in ordinary speech I am not convinced that a desire to seize or retain the reins of state is the only motive which can ever put the contestants into a state of civil war. If all the other requirements are satisfied, I believe that there would be a civil war if the objective was not to seize complete political power, but (say) to force changes in the way in which power is exercised, without fundamentally changing the existing political structure. Again, other requirements being satisfied, I believe that there would be a civil war if the participants were activated by tribal, racial or ethnic animosities. Nevertheless, one should, in my view, always begin by

inquiring whether the parties have the object of seizing or retaining dominion over the whole or part of the state. If it is found that they do not, there may still be a civil war; but it will then be necessary to look closely at the events to see whether they display the degree of coherence and community of purpose which helps to distinguish a war from a mere tumultuous internal upheaval."

This is the only case of which I am aware which suggests that "civil war" may exist even if no party has "the object of seizing or retaining dominion over the whole or part of the state." With respect, this suggestion seems to me wrong. It cannot square with American authority as declared in *Pan Am,* which, drawing upon *Davila* and the *Prize Cases,* holds in essence that "the specific purpose of overthrowing the constituted government and seizing its powers" is a necessary element of both "insurrection" and "civil war." And Justice Mustill himself returns to what I regard as the mainstream of authority when he says at 431:

"It may not be unfair to say that the government had been reduced to the level of an ineffectual spectator, standing powerless on the sidelines. But none of the participants (or at least of the major groupings) was at this stage fighting to supplant it; and still less did they claim already to have supplanted it, by establishing a government of their own (notwithstanding certain isolated evidence of the occasional use of phrases such as 'provisional government', which can hardly be taken at their face value). Nor were the combatants setting out to establish a separate state, split off from the existing territory of the Lebanon. As I have said, partition was not in January, 1976, a live political issue."

And again, at the same page:

"It is also true that these groups came into violent conflict with others of the opposite opinion. But this conflict was a reflection of the views held, not a means of imposing them on the nation as a whole .... [I]f one asks whether the Moslems and radicals were engaged in an all-out concerted effort to change the constitution by force, it seems to me plainly that they were not. Thus, I do not find in the Lebanese struggle, in the shape which it possessed in January, 1976, the indicia of a civil war, in the more usual sense of the term."

Aetna has not proved the existence of a "civil war" for insurance purposes under American authority. There was prolonged violence and much bloodshed; and during the course of that violence the Holiday Inn was much damaged. But the Mourabitoun, in seeking to dislodge the Phalange from the Holiday Inn, were not acting for the specific purpose of overthrowing the Lebanese government. They did not proclaim a casting off of allegiance to that government; they did not proclaim or seek to establish a government of their own. That is equally true of other factions who assisted the Mourabitoun in the fighting around the Holiday Inn, or the more general groupings with whom those factions could, at various times and for certain purposes, be intermittently identified. An attack upon a Phalangist-held series of hotels in West Beirut was neither an attack upon the existing government of Lebanon nor an effort to set up another government. The Phalange supported the status quo because that was the view of its leader, Pierre Gemayel; but the Phalange was not the government. As in the concept of "insurrection," it is only the events of late March, 1976, that furnish an arguable basis for the finding of a civil war; but the proof or intent and objective fails, essentially for the same reasons previously discussed.

Within the context of a casting off of allegiance to the state, Aetna lays stress upon the concept of partition of Lebanon. I fully accept, as the cases indicate, that the partitioning of a sovereign state into separate parts may be an objective of participants in a civil war. As we have seen, in *Spinney's, supra,* Justice Mustill said in part at 431: "Nor were the combatants setting out to establish a separate state, split off from the existing territory of the Lebanon." And, as Aetna points out, the American Confederacy was not attempting to overthrow the entire United States government,

in the sense of seeking to impose its sovereignty and form of government upon all the states of the Union.

However, a civil war whose objective is partition of the state (as opposed to imposing a new form of government upon the entire state, as in Nicaragua) demonstrates the same basic characteristics referred to in the cases. In respect of that part of the state sought to be partitioned away, the constituted government is sought to be overthrown, and its powers seized; liberty and independence are pursued, in order that a new sovereign state may emerge in the partitioned territory; allegiance to the former state, at least within the boundaries of the partitioned territory, is irrevocably cast off.

Aetna has failed to prove that any of the factions involved in any way with the damage to the Holiday Inn embraced partition of Lebanon as a specific objective. It is true that Bulloch referred in his evidence to a "de facto partition of the country" as a result of the fighting.[140] Randal testified that partition became a de facto reality as of January, 1976, both in the city and the countryside.[141] There is no question but that identifiable geographic areas came to be dominated and populated by one group or another. For example, the "green line" dividing east (Christian) from west (Moslem) Beirut is a manifestation of de facto partition of the city. But this is not the sort of partition which must be shown to demonstrate the existence of a civil war. That "de facto partition" which results from force of circumstance is not the same as a partition which is the specific objective of one of the contending sides. It is in that latter sense that the Confederacy sought to partition the Union. There is no persuasive evidence of the existence of such an intent or objective in Lebanon at the pertinent times.

Ambassador Godley, speaking of events through January, 1976, expressed the view that while "partition was mentioned principally as a threat by the Christians against the Moslems, ... we didn't take it seriously.... We always felt in the embassy that that was a pipe dream.... Then I felt, as did my colleagues, that cantonization [Godley's synonym for partition] was an impossible solution to the Lebanese situation at that time."[142] Bulloch wrote in a newspaper dispatch of August 13, 1976 that Pierre Gemayel had spoken of the "possibility of a Maronite state being established," and wrote further on August 14 that Gemayel, as head of the Phalange, "made it clear that partition of the country was being considered."[143] Even taking these declarations at their face value (as opposed to tactical threats, not to be taken seriously, as Godley testified of an earlier time), they fall well short of constituting a fixed and immutable purpose. Furthermore, declarations in August of 1976 are of questionable probative weight in determining state of mind and intent in March, 1976. Two of Aetna's own witnesses negated partition as an objective of their respective factions: Moussa Prince of the National Liberal Party (allied with the right),[144] and Nidim Samra of the Syrian Nationalist Social Party (allied with the left).[145] I give greater weight to this testimony than to that of Randal, who expressed the view that the actions of certain Christian rightists, in January, 1976, "whether they admitted it or not, and some of the more candid leaders did admit it, was an effort to set up partition."[146] I do not accept that, at the times with which I am concerned, the Christian right wing had embarked upon a deliberate course of action to achieve partition. It is more accurate to say that these factions had as their objective the preservation of the status quo over all Lebanon. Partition might come; it might prove to be a useful threat; but it

**140.** Tr. 157–58.

**141.** Randal dep. at 137.

**142.** Tr. 590–91.

**143.** Ex. 13 and 14 to Bulloch deposition.

**144.** "We were ourselves against the partition." Tr. 246.

**145.** "We don't believe in partition." Tr. 359.

**146.** Randal dep. at 59, 60, 65–66.

was not an objective at these particular times, either of the right wing factions or of the factions on the left. On this point, the evidence before me leads me to the same conclusion as that expressed by Justice Mustill in *Spinney's* on the evidence before him:

"... the population was still very mixed, and anyone attempting by force to parcel up the country on religious lines would have faced a most formidable problem. Possibly certain Christian leaders felt that if all else failed a partition would be better than the progressive erosion of what they saw as the distinctive character and sovereignty of Lebanon by the pressures of Pan-Arabism and Palestinian nationalism. But no faction was fighting under the banner of partition, and whatever exactly may have been in the minds of the leadership, the prime and avowed object of the Christian groups was to keep the Lebanon as it was." *Id.* at 425.

Aetna has failed to prove that the damage to the Holiday Inn is covered by the "civil war" exclusion in the policy of insurance.

### (2) *War.*

In *Pan Am,* at 1012–1013, the Second Circuit defined war as:

"... a course of hostility engaged in by entities that have at least significant attributes of sovereignty. Under international law war is waged by states or state-like entities."

The insurance definition is essentially the same:

"English and American cases dealing with the insurance meaning of 'war' have defined it in accordance with the ancient international law definition: war refers to and includes only hostilities carried on by entities that constitute governments at least de facto in character."

And *Pan Am* adds this observation and authority:

"War can exist between quasi-sovereign entities. Cf. *Hamdi & Ibrahim Mango*

*Co. v. Reliance Insurance Co.,* 291 F.2d 437, 442 (2d Cir.1961)."

*Pan Am* does not undertake detailed definitions of "entities that have at least significant attributes of sovereignty," "governments at least de facto in character," and "quasi-sovereign entities." To my mind the phrases appear to be interchangeable. Some enlightenment as to what these labels mean is found in the cases.

In *Pan Am,* the Popular Front for the Liberation of Palestine, which hijacked the insured plane, maintained its largest numerical presence in Jordan. See Judge Frankel's opinion for this Court at 368 F.Supp. 1107–08. At the time pertinent to that case, "fedayeen" groups of which the PFLP was one [147] had come "increasingly to assume control over administration and discipline within the refugee camps." *Id.* at 1109. Judge Frankel continued:

"With the not necessarily enthusiastic acquiescence of the Jordanian Government, fedayeen vehicles bore their own license plate identifications. Camps for military training, particularly for commando-type operations, were run and exclusively controlled by fedayeen organizations." *Ibid.*

The judge then had to consider, *inter alia,* whether the PFLP's destination of the aircraft constituted a loss from the excluded cause of a "military or usurped power" in Jordan. Judge Frankel held that "occupation of ground by sufferance of the *de jure* government is clearly insufficient" to constitute a group as a "military or usurped power." *Id.* at 1129. The judge continued:

"The record does not sustain on any theory the notion of the PFLP as a 'military or usurped power.' They had not at any pertinent time seized or controlled any territory *over the opposition of the Jordanian government.* They 'occupied' a training camp at Salt while the fedayeen were being tolerated generally—a barren and exiguous facility containing some caves, tents, and rudimentary structures. Then they 'seized' Dawson's Field just

**147.** "Fedayeen" are Arab individuals committed to political objectives to the point of preparedness to die for them. They are dedicated to the reconquest of Palestine from Israel. *Pan Am* at 368 F.Supp. 1106 n. 6.

before the September 6 hijacking. But that strip was an unoccupied area on a desert plateau. Neither *the uncontested occupation* of the Salt camp nor the brief episode at Dawson's Field constituted such 'control of territory' as the phrase connotes." *Id.* at 1130 (emphasis added).

On appeal, the Second Circuit agreed with the district court that the PFLP could not be regarded as a military or usurped power, citing *Insurance Co. v. Boon,* 95 U.S. (5 Otto) 117, 127, 24 L.Ed. 395 (1877) for the proposition that "usurped power is either the power exerted by invading foreign enemies or by an internal armed force in rebellion 'sufficient to supplant the laws of the land and displace the constituted authorities.'" 505 F.2d at 1011.

While in the case at bar Aetna does not rely upon the exclusion of "military or usurped power," the foregoing discussion is pertinent because the Second Circuit in *Pan Am,* also holding that the "war" exclusion did not apply, stated at 1012:

"The PFLP was not a de facto government in the context of 'war' for substantially the same reasons that it was not a government in the context of 'military . . . or usurped power.'"

Rejecting the concept of a loss caused by "war" in *Pan Am,* the Second Circuit noted that "[t]he PFLP has never claimed to be a state," and that cases such as *Curtis & Sons, supra,* and *Pesquerias y Secaderos, supra,* to the extent relevant, imply "that a guerrilla group must have at least some incidents of sovereignty before its activities can properly be styled 'war.'" *Id.* at 1013. The "incidents of sovereignty" in those latter cases included, as we have seen, the seizure of territory contrary to the will of the *de jure* government, and proclamation by the insurgents of a rival, supplanting government.

In *Pan Am,* the Second Circuit referred us to *Hamdi & Ibrahim Mango Co. v. Reliance Insurance Co.,* 291 F.2d 437, 442 (2d Cir.1961), for the proposition that: "War can exist between quasi-sovereign entities." *Hamdi* involved the loss of insured cargo originally scheduled for overland transportation from Detroit to New York and Baltimore, and from there by sea to the port of Haifa in what was then Palestine, and finally overland to Amman, Jordan. The goods were landed at Haifa; but in the meantime, "hostilities had broken out in Palestine between the Israelis and the Arabs after the resolution of partition adopted by the General Assembly of the United Nations on November 24, 1947." 291 F.2d at 439. Certain of the shipments were destroyed by mortar fire during the clash between the Israelis and the Arabs in Haifa on April 21–22, 1948. Judge Sugarman held for this court that "a state of war existed in Haifa on April 21–22, 1948, when the goods stored at the Haifa port were destroyed," *id.* at 442, and held that the loss was excluded from coverage by the terms "hostilities or warlike operations." The Second Circuit affirmed. In *Pan Am,* the Second Circuit explained the result in *Hamdi* by stating: "Arguably, the loss was not caused by fighting between governments, but all of the other indicia of warlike operations were present." 505 F.2d at 1017.

In my view, these authorities help to define a "de facto government" or a "quasi-sovereign entity." It is not sufficient to achieve such status that the group or entity in question occupy territory within the boundary of the sovereign state upon the consent of that state's *de jure* government. That is so, even if that government's consent extends to permitting its guests to exercise considerable control and autonomy within the camps or other facilities in which they dwell. "De facto governments" manifest "attributes of sovereignty" when they stake out and maintain adverse claims to territory, accompanying those claims with declarations of independence and sovereignty. This is the clear thrust of the cases previously discussed. *Hamdi, supra,* falls within that category because the Arabs and the Israelis bitterly contested control and sovereignty over that portion of former Palestine which had been partitioned so as to constitute the new state of Israel.

In the light of these authorities, I turn to Aetna's contention that a "war" in Lebanon during the relevant period of time caused or contributed to the damage to the Holiday Inn.

Aetna argues that the conflict in Lebanon involved "three clearly-defined independent entities, each having the attributes of sovereignty or, at the very least, quasi-sovereignty." Main Brief at 75. These three entities are said to be: Syria; the P.L.O.; and "the Lebanese rightists who considered themselves the defenders of the Lebanese state." *Ibid.* Since as the evidence shows it was primarily the Phalange whose presence in the Holiday Inn triggered the fighting that led to the damage to that structure, I must focus upon that group in evaluating Aetna's claim of quasi-sovereign status.

There is no substance to that suggestion. I accept that the Phalange, and those factions allied with them, "considered themselves the defenders of the Lebanese state," or, to state it more precisely, the defenders of the status quo. But it hardly follows that the Phalange, in defending the state, became the state, or achieved any attributes of sovereignty, as those attributes are defined by case law. The Phalange was a private militia. Its chief was Pierre Gemayel. The sovereign state of Lebanon was administered *de jure* by its government, consisting of president, prime minister, lesser ministers, and parliament. The most important officers of the government were President Franjieh and Prime Minister Karami. They never left office during the pertinent times. Subsequently, Sarkis succeeded Franjieh as president, as the result of parliamentary action. The parliament functioned under considerable difficulty, to be sure, but it functioned nonetheless; there was always an identifiable Lebanese government; the Lebanese rightists who considered themselves the defenders of the Lebanese state cannot reasonably be regarded as contesting the sovereignty of that state, or as proclaiming any rival sovereignty or quasi-sovereignty of their own. The most that can be said is that as the power of the central government to control affairs in Lebanon diminished, groups such as the Phalange came to the fore in conducting the fighting in certain areas. But that is not sufficient, under the cases, to

endow the Phalange or comparable entities with the attributes of sovereignty or quasi-sovereignty.

Syria participated in the fighting in Lebanon; and Syria is, of course, a sovereign state. However, to invoke the policy exclusion for "war," Aetna must show that the damage to the Holiday Inn was caused or contributed to by fighting between Syria and another governmental entity. As Judge Frankel observed for this Court in *Pan Am,* at 368 F.Supp. 1130, "the term 'war' has been defined almost always as the employment of force *between* governments or entities essentially like governments, at least *de facto.*"

When Syria intervened militarily in Lebanese affairs, its forces entered the territory of another sovereign state. But this involvement did not give rise to a war between the governments of Syria and Lebanon. On the contrary: the evidence makes it clear that, at the pertinent times, Syria's intervention was for peacekeeping purposes, specifically directed towards sustaining the Lebanese government in its then existing form. Syria became involved in Lebanon not as the result of a war with Lebanon or any other sovereign state, but rather as the result of a "brokered" diplomatic arrangement, also involving the United States and Israel, which was intended to preserve the state of Lebanon.

Syrian and Syrian-controlled forces did become involved in fighting in Lebanon. As of March 28, 1976, one witness estimated that 10,000 PLA and Saiqa troops were stationed in the country.[148] Initially these forces were deployed to stabilize and patrol the "green line" in Beirut, and to assist in the preservation of a cease-fire. At a later time, as previously described, these Syrian-controlled forces blocked a Lebanese Arab Army assault on the presidential palace. As strife in Lebanon continued, the Syrians sent in regular army infantry and army divisions, which became engaged in combat with leftist and Palestinian forces. However, none of these activities demonstrates that the cause, or a contributing cause, of

**148.** Bulloch dep. at 180–181.

the damage to the Holiday Inn was a "war" involving Syria. The events of June, 1976 and thereafter are irrelevant, because they fall outside the period of time with which I am concerned. In any event, Syria was never at war with another sovereign or quasi-sovereign.

Aetna contends that the P.L.O. was a quasi-sovereign entity; and since a time came when Syrian forces were in combat with Palestinians, a war existed between Syria and the P.L.O. I reject this argument for several reasons.

First, I do not accept that the P.L.O. claimed or demonstrated those attributes of sovereignty which the cases require. The P.L.O. was formed in 1964, when representatives of various Palestinian groups met in Jerusalem for the purpose. Arafat headed el Fatah, the largest and most powerful of these groups, and in consequence became chairman of the P.L.O.[149] In that capacity, Arafat headed the Palestinian delegation which negotiated the Cairo Agreement with the Lebanese government in November, 1969. As previously noted, it was that agreement which governed the continuing Palestinian presence in Lebanon. The text of the agreement recites the signatories' cooperation "within the framework of Lebanese sovereignty and security." Paragraph 13 provides that "the Lebanese authorities, both civil and military, shall continue to exercise all their prerogatives and responsibilities in all areas of Lebanon in all circumstances..." In short, the P.L.O. in this document specifically recognized Lebanese sovereignty and undertook not to disturb it.

In consequence, the Palestinians' presence in Lebanon occurred with the consent of the *de jure* government. It is in contemplation of law no different from that consensual presence on the part of the PFLP in Jordan which was held in *Pan Am* to fall short of an attribute of sovereignty. In Lebanon we deal with larger numbers, but the principle is the same.

There is evidence from which I could find that certain right-wing individuals believed that Arafat had not kept his promise to respect Lebanese sovereignty. Certainly the Phalange was increasingly motivated to move against the growing Palestinian presence, centered in the various refugee camps. But it does not follow that the P.L.O. was claiming the attributes of sovereignty, or exercising the powers of de facto government, within the context of its presence in Lebanon. As far as Arafat, the titular leader of the P.L.O., was concerned, the evidence shows that his purpose was to avoid involvement with Lebanese politics, and by doing so maintain that peaceful and cooperative presence sought to be achieved by the Cairo Agreement. The fact that Palestinian fighters, including members of the Fatah, eventually came into conflict with the Phalange militia (in the refugee camps and hotel district of Beirut) and with Syria and Syrian-controlled forces (in the mountains to the east) do not change this analysis.

Secondly, the Palestinians in Lebanon did not have that unified structure and purpose which Aetna's references to the P.L.O. would suggest. In point of fact, the Palestinians within Lebanon were divided among themselves as to what the policy should be. Thus Bulloch wrote, in a dispatch dated August 12, 1976:[150]

> "On the Left the Palestinians are hopelessly split. The major group within the Palestine Liberation Organization, Fatah, would be willing to try to reach a compromise. But the organizations of the so-called Rejection Front want no negotiations at all, and in Beirut one man with a gun wrecks any cease fire."

That is an equally apt description of conditions at the time when the Holiday Inn was involved in fighting.

While the P.L.O. received certain recognitions and courtesies from the United Nations and the Arab League, they do not rise to the level of the status of a sovereign state, or that of an entity exercising the powers of de facto government within the boundaries of the Republic of Lebanon.

---

**149.** See discussion in *Pan Am* at 368 F.Supp. 1106.

**150.** See Bulloch dep. at 270.

Finally, assuming *arguendo* that the P.L.O./Palestinians in Lebanon should be regarded as a quasi-sovereign entity, they were not conducting a war with another governmental entity which caused or contributed to damage to the Holiday Inn. Although the Mourabitouns' successful recapture of the Holiday Inn in March, 1976 took place with the assistance of Fatah fighters, the Palestinian effort was directed against the Phalange, which for the reasons stated *supra* cannot be equated with the sovereign state of Lebanon or its established government. As for the Palestinians' combat with Syrian forces to the east, that conflict occurred after the relevant period, and is not causally connected in any way to the damage to the Holiday Inn.

Aetna has failed to prove that the loss was caused or contributed to by the excluded peril of "war."

## CONCLUSION

■ Aetna, as an all risk insurer, had the burden of proving that the damage to the Holiday Inn was caused by a peril whose consequences were excluded by the policy. It undertook to show that the damage resulted from "insurrection," "civil war," or "war," as those terms are used in insurance policies. Having failed to sustain that burden, Aetna is liable under the policy.

Elements of intent, purpose, and sovereign status lie at the heart of these concepts. In *Pan Am* the Second Circuit defined those elements, several months before the policy in suit was negotiated. Aetna had to prove them. From the welter of trial evidence, some of it impassioned, some more objective, Aetna derives a number of arguments and theories, some more plausible than others. But even the more plausible theories are countered by equally reasonable interpretations of the proven facts which undermine the defense. That is the essence of Aetna's failure of proof.

The Holiday Inn was damaged by a series of factional "civil commotions," of increasing violence. The Lebanese government could not deal effectively with these commotions. The country came close to anarchy. But the constitutional government existed throughout; the requisite intent to overthrow it has not been proved to the exclusion of other interpretations; and there was no "war" in Lebanon between sovereign or quasi-sovereign states.

Because the existence of none of the excluded causes has been demonstrated at the pertinent times, the provision in the policy excluding their remote or indirect consequences does not come into play. HI paid a negotiated additional premium for "civil commotion" coverage, as part of its all risk policy. It is entitled to recover on that policy.

Journalists and politicians invariably referred to these events in Lebanon as a "civil war." They do so today. The Court's task, however, is to give the words at issue their insurance meaning; and to place the burden of proof in accordance with law. At the end of that exercise, I find for HI on the question of coverage.

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

In consequence, HI is entitled to entry of judgment on the issue of liability under the policy. The parties are directed to explore the possibility of settling the quantum of damages, failing which a reference will be ordered. Counsel are directed to advise the Court by letter of their progress in that regard, not later than sixty (60) days from the date of this Memorandum. Following entry of the judgment on liability, the case will be placed on the Suspense Docket of this Court pending counsel's report on damages negotiations.

Settle judgment on notice.